**OTIS ELEVATOR COMPANY, Appellant,**

v.

**Wilson C. McLANEY, Appellee.**

**No. 537.**

Supreme Court of Alaska.

Sept. 27, 1965.

Robert C. Erwin and David H. Thorsness, Hughes, Thorsness & Lowe, Anchorage, for appellant.

James K. Tallman, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

RABINOWITZ, Justice.

In this action Wilson McLaney sued the Otis Elevator Company for personal injuries allegedly caused by Otis Elevator's negligent maintenance of a terminal elevator at Anchorage International Airport.[1] After a trial by jury in which McLaney obtained a favorable verdict, Otis Elevator appealed.

At the trial there was evidence adduced which tended to establish the following: On December 6, 1961, the day the accident occurred, McLaney was employed by Pacific Northern Airlines in the capacity of a ground service employee at the Anchorage International Airport. At the time in question McLaney was in the process of taking

1. Originally the State of Alaska was also a party defendant but pursuant to stipulation entered into during the trial, McLaney's cause of action against the State of Alaska was dismissed.

an empty baggage cart from the lower level to the upper level of the airport for the purpose of fixing a flat tire on the cart. In order to move the cart to the upper level, McLaney used the terminal's freight elevator. When he arrived at the upper level, McLaney experienced difficulty in opening the elevator's inner mesh door which had jammed after partially lifting (the mesh door was part of the elevator and moved with it). After McLaney managed to open the mesh door as far as possible, he then attempted to open the stationary—horizontally—bi-parting doors which were located at the upper level of the elevator shaft. McLaney also experienced difficulty in opening the bi-parting doors finding them "frozen stuck." After prying the bi-parting doors approximately eight inches apart with a 2 x 4, he placed one foot on the lower door and while pushing up with his hands on the upper door and down with his foot on the lower door, he fell. In the course of his fall McLaney straddled the top of the lower door sustaining injuries to his pelvic and genital regions.

Due to his failure to answer fully certain interrogatories which Otis Elevator had propounded prior to trial, the lower court restricted the proof that McLaney could offer at trial regarding the question of liability. In effect, McLaney's proof was limited, as to Otis' claimed negligence, "to an alleged failure to lubricate the doors in question properly."

On the question of Otis' alleged failure to properly lubricate, the plaintiff below offered testimony to the effect that: The bi-parting doors in question were more difficult to open in the winter than in the summer. That due to the difficulty usually encountered in opening these upper level bi-parting doors, it was customary for a person attempting to open them to push down on the lower door with his feet and to simultaneously pull up on the upper door with his hands. McLaney himself testified that the day after the accident occurred he examined the bi-parting doors and that:

there was thick grease looked like it was dried out and it was hard as * * * pretty hard, you know, just looked like dried out and dusty like or something and hard, just * * * just mighty hard, and be in big lumps in spots you know.

The doors in question moved on runners which Otis Elevator, pursuant to the terms of its contract with the State of Alaska (owner of Anchorage International Airport and the elevator in question), was required to "regularly and systematically examine * * * [and] * * * lubricate as required."

In addition to McLaney's testimony there was other testimony as to the lack of lubricants in the bi-parting doors' runners at various times prior to the accident. Other witnesses testified to observing "grease" and to the "stiffness" and "hardness" of the lubricants used in the runners.

Due to the erroneous admission into evidence of hearsay complaints pertaining to the bi-parting doors, as well as reputation evidence concerning condition of the elevator's bi-parting doors, we have concluded that a new trial is required. These evidentiary issues will be disposed of subsequent to discussion of certain other issues that appellant has raised.

■■ In this appeal, Otis urges as error the lower court's refusal to grant its motions for directed verdict and for judgment notwithstanding verdict. We have concluded that no error was committed by the lower court in denying Otis' motions for directed verdict and judgment notwithstanding verdict. In determining whether error was committed in relation to these motions, this court views the evidence in its strongest light in favor of the party against whom the motions were made.[2] Review of the record convinces us that a jury question was presented as to the issues

2. 5 Moore, Federal Practice § 50.02 [1], at 2316 (2d ed. 1964); 2B Barron & Holtzoff, Federal Practice and Procedure § 1075, at 381–83 (Rules ed. 1961).

of Otis Elevator's negligence and proximate cause because fair-minded jurors could differ as to the conclusions of fact that might be drawn from the evidence which was presented as to these questions.[3]

In short we are satisfied that whether Otis' lubrication of the bi-parting doors was negligent and whether such negligence proximately caused McLaney's injuries were questions for the jury to resolve under appropriate instructions from the trial judge. We cannot say that fair-minded jurors might not have drawn the inferences that Otis failed to properly lubricate the runners and that such failure proximately caused the accident in question.

■■ Appellant Otis Elevator also argues as grounds for reversal the trial court's failure to grant a new trial due to alleged misconduct on the part of appellee's counsel. Appellant primarily asserts that the misconduct of appellee's counsel consisted in the intentional and repeated propounding of questions which sought to elicit inadmissible testimony.[4] We agree with the authorities cited by appellant to the effect that the granting of a new trial is an appropriate remedy where improper questioning has occurred in a jury trial.[5] On the other hand, our review of the record con-

vinces us that the trial judge was correct in refusing to grant Otis a new trial on the asserted ground of counsel's misconduct. The trial judge, in his discretion, is best able to determine whether there was any intentional misconduct on the part of McLaney's counsel and to evaluate the probable impact of counsel's questioning upon the jury in ruling upon a motion for new trial. We have held on other occasions that the granting or refusing of a motion for a new trial rests in the sound discretion of the trial judge and that we will refrain from interfering with the exercise of such discretion except "in the most exceptional circumstances to prevent a miscarriage of justice."[6] Our reading of the record fails to disclose such exceptional circumstances as would lead us to reverse the trial judge's denial of a new trial on the grounds of counsel's improper questioning.

Appellant Otis Elevator additionally urges as error the trial court's admission into evidence of the deposition of Harlin McDowell, a witness for plaintiff. Appellant argues there was no showing that this witness was at a greater distance than 100 miles from the place of trial or that McLaney, despite diligent efforts on his part, could not procure the attendance of the witness by subpoena.[7]

---

3. Saxton v. Harris, 395 P.2d 71, 73 (Alaska 1964); Patterson v. Cushman, 394 P.2d 657, 660 (Alaska 1964); Nielson v. DeWitt, 390 P.2d 781, 782 (Alaska 1964); McCoy v. Alaska Brick Co., 389 P.2d 1009, 1010 (Alaska 1964); Olson v. McRae, 389 P.2d 576, 577 (Alaska 1964); Snipes v. March, 378 P.2d 827, 828 (Alaska 1963); 2B Barron & Holtzoff, Federal Practice and Procedure § 1075, at 377 (Rules ed. 1961).

4. Appellant has grouped these "improper" questions into four categories: (1) questions concerning the operation of the bi-parting doors in 1956–57; (2) questions concerning the need for the installation of an automatic door; (3) questions pertaining to the change of lubricants and other repairs after the date of the accident; (4) questions in regard to hearsay complaints about the elevator's bi-parting doors.

Appellant contends that the mere asking of questions in these categories was prejudicial regardless of whether or not the trial judge sustained appellant's objections to them.

5. See Horany v. Paris, 369 P.2d 636, 637 (Okl.1962), which is typical of the authorities in this area.

6. Alaska State Housing Authority v. Vincent, 396 P.2d 531, 535 (Alaska 1964); Montgomery Ward v. Thomas, 394 P.2d 774, 775 (Alaska 1964); Ahlstrom v. Cummings, 388 P.2d 261, 262 (Alaska 1964).

7. Civil Rules 26(d) (3), [b] and [d] provide:
   (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:

The record discloses that a subpoena was issued on July 16, 1964, requiring the witness Harlin McDowell to appear in the superior court in Anchorage on the same day at 2:00 P.M. A Not Found Return was filed on July 16, 1964. This return reads in part that after "due search and diligent inquiry" the process server was unable to find the witness in the Third Judicial District but that he was informed the witness was "working north of Willow, Alaska." On July 17, 1964, plaintiff below offered McDowell's deposition into evidence under Rule 26(d) (3), [b] and [d]. The trial court deferred ruling. Subsequently in the trial plaintiff again moved to have the deposition of Harlin McDowell read into evidence. In addition to the sub-subsections of Rule 26(d) (3) previously cited, counsel for plaintiff, at this time, indicated he was now relying upon Rule 26(d) (3) [e].[8] At this second offering of the McDowell deposition, counsel for McLaney stated in part:

> And I also suggest that the witness is probably * * * in all probability although I'm not * * * I'm unable to prove it at this moment * * * more than a hundred miles from Anchorage since the return indicates that he's north of Willow.

In objection to the admissibility of the deposition, counsel for Otis argued:

> We would object to the use of the deposition, Your Honor, on two

grounds: (1) that there is no showing that the * * * that sub-paragraph (d) has been complied with. There's no showing and I will require a showing that the place he says his witness is, is beyond a hundred miles; secondly, that the deposition of this man has been taken and is simply cumulative of prior testimony of the other witnesses, repitious [sic] and unless there is something particularly different about this testimony that is to be shown.

■■ The trial court then overruled Otis' objections to the McDowell deposition.[9] We agree with appellant that the record does not show that the witness McDowell was more than 100 miles from Anchorage at the time the trial was taking place. Nor do we find in the record any exceptional circumstances which would permit the use of the deposition under Rule 26(d) (3) [e]. Although a stronger showing of due diligence on appellee's part in attempting to serve McDowell might' have been required, we are not convinced that this case presents an appropriate occasion to interfere with the trial judge's discretion in regard to his permitting the deposition to be read. We, therefore, are of the opinion that, under the provisions of Rule 26(d) (3) [d], the trial judge did not err in admitting into evidence the deposition of Harlin McDowell.[10] We are also of the opinion that those portions of the McDowell deposition which were admitted into evidence were

---

> * * * * *
> [b] that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or
> * * * * *
> [d] that the party offering the deposition has been unable to procure the attendance of the witness by subpoena.

8. Civ.R. 26(d) (3) [e] provides:
> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
> * * * * *

> [e] upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

9. The trial court then heard in great detail, out of the jury's presence, counsel for Otis' objections to portions 'of the McDowell deposition and ruled favorably upon most of Otis' objections.

10. See McBride v. State, 368 P.2d 925, 927–28 (Alaska 1962), for a discussion of the question of diligence in attempting to locate a witness in a criminal trial.

merely cumulative of other evidence that plaintiff introduced and that if any error was committed in permitting McDowell's deposition to be read, it was in the nature of harmless error. See Civil Rule 61 [11] and the following authorities in regard to harmless error: Meyst v. East Fifth Ave. Serv. Inc., 401 P.2d 430, 437 (Alaska 1965); Alaska Brick Co. v. McCoy, 400 P.2d 454, 456 (Alaska 1965); Mitchell v. Knight, 394 P.2d 892, 896 (Alaska 1964); Zerbinos v. Lewis, 394 P.2d 886, 889–90 (Alaska 1964); Davidsen v. Kirkland, 362 P.2d 1068, 1069–1070 (Alaska 1961).

Appellant further contends that the trial court erred in admitting hearsay-reputation evidence as to the elevator's operation. We are of the opinion that error was committed and that the admission of such evidence was prejudicial rather than harmless error. Illustrative of the instances where appellant contends the trial court erred in admitting hearsay-reputation evidence are the following excerpts from the testimony of two of plaintiff's witnesses, Paul Adamson and Lawrence W. Bowles.

While on direct examination, Paul Adamson testified as follows:

Q Then, are you able to state, Mr. Adamson, what the status of the elevator was in the discussions or information that was known to you among the crews, etc.?

MR. THORSNESS: Object to as hearsay.

Q Well, let me ask you this. Did you hear complaints from other personnel with whom you were working?

MR. THORSNESS: Same objection.

MR. TALLMAN: I think that's a proper question, Your Honor.

* * *

THE COURT: * * * (continuing) I'll overrule the objection.

Q I didn't understand your answer.

A Yes.

Q. Are you able to indicate to what extent the other personnel discussed this particular elevator or complained about this elevator without stating what their particular complaints were?

MR. THORSNESS: May I have a continuing objection on this also, Your Honor?

THE COURT: I'm going to sustain that objection to this line of particular question as to whether or not the other people may have discussed it.

Q Can you state * * * then let me ask you this * * * can you state to what extent the difficulty in operating the elevator was known among the crew that you worked with?

THE COURT: Now this, you understand, is being limited to prior to December of 1961.

Q * * * (continuing) Prior. Prior to December 6th, 1961.

A Well, myself, before this date, I know ever since I've been there it has been, off and on, hard to operate.

Q Well, the question was, was the knowledge of the other crew members or the extent to which it was known among other crew members, is what I'm referring to?

A Well, it was very difficult for them also.

---

11. Civ.R. 61 provides:
No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Q Well, I mean, did they know that * * *

A Right.

The following took place while Lawrence W. Bowles was testifying:

Q Do you know whether or not the crew discussed the operation of the elevator?

A Oh, I heard them, yes.

Q And, are you able to state without stating what was actually said, are you able to state what the degree of knowledge that the elevator was difficult to open * * * operate was, prior to December 6th, 1961, among the crews that you worked with?

MR. THORSNESS: I object to the form of the question. I think it asks for an opinion of the witness, as I understand the question.

MR. TALLMAN: No. I don't want his opinion. I just want what he knows.

A You mean the condition on how it operated?

Q No, how well known this condition was among the crew members?

A Well, I've heard them discuss it several times.

Q And with respect to the people under you, to what extent did you say that they complained?

A Well, they complained to quite a few people quite often.

Q About the door sticking, is that right?

A Yes.

Admission into evidence of testimony of similar out-of-court complaints concerning the elevator's condition and evidence pertaining to the reputation of the elevator occurred during the testimony of four other witnesses for plaintiff.[12]

12. The following occurred while Larry Davis was on the witness stand:
Q Mr. Davis, are there other companies that use this airline * * * use the elevator?
A Yes.
Q Do you know whether any of the other employees of other companies, Japan Airlines, Northwest, Alaska, some twelve * * * or eleven other companies that use this, do you know whether or not they had any difficulties with the doors?
MR. THORSNESS: Object to as leading and hearsay.
THE COURT: Sustained.
Q Of your own knowledge, Mr. Davis, do you know whether or not any other people other than PNA employees had difficulties with the doors?
MR. THORSNESS: Your Honor, that's the same question. Same objection.
MR. TALLMAN: Of his own knowledge, I asked him, Your Honor.
MR. THORSNESS: Well * * *
THE COURT: The objection will be overruled. He asked him if he knew, of his own knowledge whether they did or not.
A Yes, I know that they have.

In addition to the portions of Larry Davis' testimony set out supra, the following are also pertinent:
Q Now, Mr. Davis, at or on or about the 6th day of December or prior to that, do you know of any other complaints from employees or people who used the elevator?
MR. THORSNESS: Object. It's irrelevant as what other people might have said.
THE COURT: He asked if he knew of any of them. Do you know of any without stating what they are?
A Yes.
Q Who would these complaints be by or from what people?
A Other ramp employees.
Q Are you able to characterize the extent of the complaints among the people that you worked with? First, let me ask you, how many people worked in and around the ramps for PNA?
A Well, approximately 8 or 10 ramp men.
Q Okay. Now, are you able to characterize to what extent the complaints concerning the elevators were had among the 8 to 10 employees at this time? That would be in December of 1961?

Professor McCormick writes that:

Reputation is a composite description of what the people in the community have said and are saying about a matter. A witness who testifies to reputation testifies to his generalized memory of a series of out-of-court statements. Whether reputation is hearsay depends on the same tests we have applied to evidence of particular out-of-court statements. * * *

Applying again the general definition we may conclude that evidence of repu-tation is hearsay only when offered to prove the truth of the fact reputed and hence depending for its value on the veracity of the collective asserters. * * *

* * * Evidence of reputation, not falling within the established exceptions, when offered to prove the fact reputed, is constantly being excluded as hearsay.[13]

The fact that the various witnesses had personal knowledge of out-of-court complaints about the elevator's doors or per-

MR. THORSNESS: Object. Object to this as hearsay, Your Honor?

MR. TALLMAN: I'm not asking him what they said.

THE COURT: He's not asking what they were * * * the extent of it.

MR. THORSNESS: I understand that. But he's asking him to characterize what these complaints were and the extent of it further calls for a conclusion of the witness that I don't think he's capable of making.

MR. TALLMAN: It does not, Your Honor. I'm asking him for his knowledge of what he knows about the extent of the complaint. I'm not asking him what they were.

THE COURT: You may answer the question.

A You want to know what the complaints were?

Q No.

A * * * (continuing) Or you don't?

Q To what extent did the 8 or 10 people know about the condition or had the complaints?

A Well, they all knew about it, if that's what you mean.

During the course of David Dickson's testimony, the following transpired:

Q Do you know as to what extent the question of the * * * the elevator, and particularly the doors, was known among the aircraft maintenance crews, and so forth, that were there on the International Airport?

MR. THORSNESS: Object to as irrelevant, immaterial and incompetent.

THE COURT: Your question. Would you repeat that question. I'm not sure that I understood it.

Q Do you know of your own knowledge to what extent the crews, and particularly PNA crews, knew of the condition of the elevator doors?

MR. THORSNESS: Same objection.

THE COURT: The objection will be overruled, if he knows of his own knowledge.

A It was well known around there that the elevator was hard to operate in the winter time.

During the testimony of Glenn A. Williams, the following transpired:

Q * * * Now, do you know of how common the knowledge concerning this elevator was among the crew?

A Everybody at PNA's crew knew about it.

Q And how common were the complaints, if you know * * * only if you know.

A Oh, just the guys that worked on the ramp all complained about it.

* * *

* * *

Q But you indicated that the knowledge of the difficulty of the door was common, or known to all members of your crew?

A Righto.

MR. DELANEY: I'm going to object to that, Your Honor. How could this man know what's common knowledge to maintenance employees?

THE COURT: He said the members of his crew.

Q Members of the crew * * * and how many members are in that crew?

A About twenty, I suppose.

13. McCormick, Evidence § 228, at 470 (1954). See also 5 Wigmore, Evidence §§ 1362, 1580, 1609 (3d ed. 1940), and the following decisions of this court in which the nature of hearsay is discussed: Meyst v. East Fifth Ave. Serv. Inc., 401 P.2d 430, 437 (Alaska 1965); Tracey v. State, 391 P.2d 732, 734 (Alaska 1964); Watson v. State, 387 P.2d 289, 293 (Alaska 1963).

sonal knowledge of the reputation of the elevator's operation did not change the hearsay nature of this evidence. This hearsay evidence as to reputation and out-of-court complaints was offered to prove the facts as to the manner in which the doors in question functioned. The record further shows that at no point during the trial, or in the trial court's instructions to the jury, was the jury's potential use of this evidence limited.[14] Under the circumstances, we are of the opinion that the jury could well have relied upon this inadmissible hearsay evidence to draw the inference that Otis negligently failed to lubricate the elevator's bi-parting doors. Although, as indicated previously, we have concluded that plaintiff's evidence (excluding this hearsay-reputation evidence) was sufficient to withstand Otis' motions for directed verdict and judgment notwithstanding verdict, we are of the further opinion that admission of this type of evidence was so prejudicial as to require a new trial.

██ The final point appellant raises is that the trial court erroneously admitted testimony concerning the changing by Otis, after the accident, of the lubricant it used on the runners of the elevator's bi-parting doors.[15] We have previously held that this type of evidence is inadmissible.[16] The trial court's admission into evidence of Otis' change of lubricant subsequent to the date of the accident was improper. In light of our previous ruling on the admission of hearsay it is unnecessary to decide whether the admission of this evidence as to the change of lubricant in and of itself would require a new trial in this appeal.

The judgment and verdict are set aside and the cause remanded for a new trial.

Reversed.

14. This evidence could properly have been limited to the issue of whether or not Otis Elevator had knowledge that the elevator was improperly lubricated. 2 Wigmore, Evidence § 252 (3 ed. 1940).

15. During plaintiff's cross-examination of defense witness Fred Hosel, the record discloses that the following took place:
Q You did change the lubricant?
A Yes.
Q And, why was that * * *
MR. THORSNESS: May I inquire, was this after 1961?
MR. HOSEL: That's what he asked me.
MR. THORNESS: Your Honor, once again, this is entirely immaterial.
THE COURT: It's immaterial and the jury will be instructed to disregard events that happened after that time pertaining to it.
Q Well, what type of lubricants were you using in 1961, December particularly?
A Light oil.
Q And what type of lubricant did you use after that?
MR. THORSNESS: I object to this as irrelevant and immaterial, Your Honor, after December of 1961.
MR. TALLMAN: I'd like to be heard on this. Your Honor, I'd like to be heard.
THE COURT: Well, let's don't argue the matter in the presence of the jury. I believe that * * * you may answer the question.
A What type of lubricant I used after, when I changed?
Q Yes.
A Slip-it.
Q Does that work better in cold weather?
A It seems to.
Q In other words, this Slip-it that you have now is less subject to cold and you'd indicated that earlier in your deposition, isn't that right?
A Yes.

16. Gunsolus v. City of Fairbanks, 391 P. 2d 13, 14 (Alaska 1964); City of Anchorage v. Steward, 374 P.2d 737 (Alaska 1962). See also 2 Wigmore, Evidence § 283, at 158 (3d ed. 1940); McCormick, Evidence § 252, at 543–45 (1954).