Annie Bell SLOAN, Individually and as Executrix of the Estate of Moses C. Sloan, Deceased, et al., Appellants,

v.

ATLANTIC RICHFIELD COMPANY, Appellees.

No. 2047.

Supreme Court of Alaska.

Oct. 15, 1975.

**719**

James R. Blair, Julian C. Rice and Hugh Fleischer, of Rice, Hoppner, Blair & Hedland, Fairbanks, for appellants.

Patrick E. Murphy, Fairbanks, John P. Cook of Lee, Smart, Cook, Dunlap & Biehl, P.S. Inc., Seattle, Wash., for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

CONNOR, Justice.

This is an appeal from a judgment based on a jury verdict in favor of appellee Atlantic Richfield Co. (ARCO) in a wrongful death action brought by the widow of a carpenter killed in a construction accident on the North Slope.

The deceased, Moses Sloan, was killed August 5, 1969, while working on the construction of the ARCO base camp at Prudhoe Bay, Alaska. Mr. Sloan was employed by Ramstad Construction Co., which had been hired by ARCO to build foundations for most, if not all, of the buildings in the camp. The foundations constructed by Ramstad consisted of cement floors several inches thick suspended from four to four and one-half feet above the ground on wooden pilings driven into the permafrost.[1] The floors were to be insulated by a two-inch layer of styrofoam underneath the concrete. A layer of plywood went underneath the styrofoam insulation to protect it and hold it in place against the cement.

In constructing such a foundation, Ramstad employees first drilled one-inch dowel holes into the pilings and then nailed two-by-fours onto the pilings above these dowel

---

1. Ramstad did not drill the holes for the pilings. This was done by several different drilling contractors.

holes. Dowel pins were placed in the holes and wedges were placed between the dowel pins and the two-by-fours. On top of this they laid two-by-ten sills ("stringers") and on top of the stringers went joists. The layer of plywood was then put down, followed by two one-inch layers of styrofoam. The plywood had holes [2] in it so that bolts could be stuck through the plywood and styrofoam up into the cement. The top end of the bolt would be held tight when the cement hardened around it. Then a washer and nut could be screwed onto the bottom end of the bolt to hold up the plywood, which in turn held up the styrofoam. The bolts were put in place after the plywood and styrofoam were installed.

These bolts were only six inches long, so that once the concrete was poured, it covered them completely, leaving no way to pull the bolts up from above. It was, of course, essential to the whole plan that those bolts stick up those few inches into the concrete, because after the concrete hardened, all the other support for the plywood (the pins, wedges, joists, stringers and other shoring) would be removed and only the bolts would be left to hold up the plywood and insulation.

During construction, these bolts would occasionally be pushed down into the styrofoam, e. g., by workers stepping on them while laying out conduits, water pipes and reinforcing materials before the concrete pour or by cement finishers and spreaders walking on them during the pour. When this happened, someone would have to go underneath the plywood deck and push or hammer the bolt back into place. According to the testimony, the bolts could be hammered back up while the cement was setting, up to one and one-half to two hours after the pour. In addition to the horizontal members (joists and stringers) supporting the plywood, there were also vertical four-by-four posts placed at vari-

ous intervals underneath the stringers to support the concrete during the pour. These posts are the "shoring" referred to throughout the testimony at the trial.

On August 5, 1969, Ramstad was to pour the cement for the floor of the automotive and welding shop. On most of the buildings being constructed, the cement was poured shortly after the forms were set. However, on the automotive and welding shop the forms and shoring had been completed approximately a week before the pour. The reason for the delay in pouring the cement was a shortage of the 6-inch bolts necessary to attach the plywood and insulation to the bottom of the floor. The bolts arrived the day before the pour and carpenters were immediately set to work installing them. They installed them in the east end first, apparently because that end was otherwise finished and because iron workers were still putting in steel (ribar-reinforcing) at the west end. They finished the east end, but at the time the pour started on August 5, carpenters were still putting in bolts on the west end. Only the east half of the building was to be poured on that day, the rest was to be poured "a couple days later". The building was approximately 100 feet long and 30 to 40 feet wide.

The pour started early in the morning of the 5th. Apparently sometime after the pour started, Merle Christensen, one of the Ramstad foremen, asked two of the carpenters working on another building, Parker Murphy and Irving Bortles, to go over to the automotive building and go underneath it to push up bolts. The bolts were already in place, but the nuts and washers had not been put on them. Apparently some, if not all, of them were "down" so that it was necessary to push them back up in order for them to stick up above the styrofoam. Bortles and Murphy could see that they were not keeping up with the

---

**2.** According to the testimony of Goebel Sisson, a carpenter, the bolts were ¼ inch thick, but the holes were slightly smaller, approximately ⁷⁄₃₂ inch. This was done so that the

bolt would be held very firmly in place with one end sticking straight up into the concrete.

pour, so Bortles went for help. He saw Merle Christensen, the foreman, told him the problem, and then went back to work. Shortly thereafter, Christensen and another carpenter, Moses Sloan, arrived to help push up the bolts and put on nuts and washers. From half an hour to an hour after Christensen and Sloan went underneath the floor, it collapsed on top of them. Christensen and Sloan were killed.

Christensen had asked at least one other carpenter, Goebel Sisson, to go under the building to help push up bolts. Mr. Sisson refused to do this because his union steward, Maurice Holvoet, had said that "he wanted no more men in under these buildings while they were pouring the concrete." Mr. Holvoet had reached this decision when, while stripping out the forms and shoring underneath the first foundation poured (that of the headquarters building, the "Prudhoe Hilton"), he noticed that the dowel pins and two-by-fours were bent, indicating (to him) insufficient shoring. He brought this to the attention of Mel Snyder, Ramstad's other carpenter foreman. Snyder and Holvoet agreed to keep men out from under the buildings while the cement was being poured.

Annie Bell Sloan, widow of Moses Sloan, filed suit against Atlantic Richfield Company on June 8, 1970, alleging over a dozen different negligent acts or omissions. ARCO's answer denied negligence on its part, and as one of its affirmative defenses alleged that Sloan's employer, Ramstad, was an independent contractor in sole and exclusive control of the project and the site of the accident. In an amendment to its answer, ARCO later added as defenses allegations of contributory negligence and assumption of risk on the decedent's part. A jury trial was held in Fairbanks. The case was submitted to the jury on May 9, 1973, with the following three forms of verdict: Verdict No. I in favor of plain-

tiff and against defendant in a blank amount; No. II in favor of defendant and against plaintiff, and No. III in favor of defendant and against plaintiff by reason of decedent's contributory negligence. The jury returned Verdict No. II, and judgment was entered thereon on May 15, 1973.

Plaintiff filed motions for new trial and judgment notwithstanding the verdict, and defendant filed a motion for attorney fees. Following a hearing, plaintiff's motions were denied and attorney's fees in the amount of $10,750 were granted to defendant.

Appellant makes three main contentions on appeal:

1. That the trial court committed reversible error by excluding certain testimony during the direct examination of Ralph Hunt and during the cross-examination of William Landis;

2. That the trial court erred in denying appellant's motions for a directed verdict and judgment n.o.v. or, in the alternative, a new trial;

3. That the trial court erred in awarding attorney fees to appellee because appellee's insurance company, not appellee, incurred the cost of attorney's fees, and because such an award would have the effect of discouraging the use of the legal system for the pursuit of bona fide claims.

### I.

With respect to the first issue, appellant argues that the court erred in sustaining an objection to the following question put to Ralph Hunt [3] by appellant's counsel on direct examination:

"Would you have expected the Atlantic Richfield personnel to make a check on this shoring, based upon your experience?"

3. Ralph Hunt was a construction engineer for Metcalf & Eddy, the company that designed the foundation for the automotive building and seven or eight other buildings in the camp for ARCO. Mr. Hunt was the resident representative for Metcalf & Eddy at the construction site.

Appellant also contends that the court erred in sustaining an objection to the following question, asked of William Landis[4] during cross-examination:

"If Mr. Hunt had testified differently in this courtroom, would that testimony be untrue?"[5]

Appellant's counsel advised the trial court that he had a series of similar questions relating to persons being under cement pours, bent pins and other matters directly concerned with the collapse of the building. Counsel was not permitted to ask any of these questions. The court sustained both objections on the theory that the questions invaded the province of the jury.

We agree that it was not improper for the court to have sustained the objections to the questions asked of Mr. Hunt and Mr. Landis, but not for the reason stated by the court.[6]

A witness does not usurp the function of a jury or invade its province by giving testimony in the form of an opinion, because the jury is under no obligation to accept the opinion of the witness. The jury, and not the witness, decides the ultimate issues of proximate cause and fault. *Meyst v. East Fifth Ave. Serv., Inc.*, 401 P.2d 430, 437–38 (Alaska 1965).

However, the court could have sustained the objection to the question asked of Mr. Hunt on the ground that it was cumulative.[7] Prior to this question, Mr. Hunt had testified regarding the necessity of shoring checks and common practices in the industry. Therefore, we affirm the court's ruling.

With respect to the question asked of William Landis, we affirm the court's ruling on the basis that it constituted a proper exercise of the judge's discretionary power to limit the repetition of questions.[8]

Moreover, assuming that the court erred in sustaining the objections, such exclusion amounted to harmless error since appellant failed to show any substantial prejudice from the exclusion of this testimony.[9]

4. Mr. Landis was one of two ARCO supervisors working at the construction site and was one of ARCO's principal defense witnesses.

5. Actually, this question was answered affirmatively by the witness and it was the question following this answer to which the court sustained an objection. That question was:

"And if Mr. Waterfield had testified differently in this courtroom, would his testimony be. . . . "

6. We may affirm a trial court's exclusion of evidence even though the affirmance is based on a ground not relied upon by the trial court. *Ransom v. Haner*, 362 P.2d 282 (Alaska 1961). *See City of Portland v. Therrow*, 230 Or. 275, 369 P.2d 762, 765 (1962); *Tucker v. Lower*, 200 Kan. 1, 434 P.2d 320, 324 (1967); *In re Estate of Carey*, 504 P.2d 793, 799 (Wyo.1972).

7. Cumulative evidence is defined as additional or corroborative evidence to the same point and which goes to prove what has already been established by other evidence. Black's Law Dictionary 455 (rev. 4th ed. 1968). The exclusion of cumulative evidence is not prejudicial. *Palfy v. Hepp*, 448 P.2d 310, 311 (Alaska 1968).

8. 3 Wigmore, Evidence § 782, at 181–83 (Chadbourn rev. 1970); *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *Hider v. Gelbach*, 135 F.2d 693, 695–96 (4th Cir. 1943); *Simpson v. State*, 32 Wis.2d 195, 145 N.W.2d 206 (1966), *cert. denied* 386 U.S. 965, 87 S.Ct. 1046, 18 L.Ed.2d 116 (1967).

9. Alaska Civil Rule 61 provides, in part, that:

"No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Civil Rule 61 is identical to Federal Rule of Civil Procedure 61 and has been interpreted by the federal courts to require the appellant on appeal to bear the burden of proving prejudice as well as error. That view is in accord with this court's interpretation of the rule. *Zerbinos v. Lewis*, 394 P.2d 886, 889–90 (Alaska 1964).

## II.

■ Appellant next argues that the court erred in denying her motions for a directed verdict or for a judgment notwithstanding the verdict or, in the alternative, for a new trial.[10]

■ A directed verdict or judgment n. o.v. is justified "only if the evidence [is] such that fair minded men, in the exercise of reasonable judgment, could not differ . . . ." *Snipes v. March,* 378 P.2d 827, 828 (Alaska 1963). *See Alaska State Housing Authority v. Vincent,* 396 P.2d 531, 535 (Alaska 1964); *Otis Elevator Co. v. McLaney,* 406 P.2d 7, 9–10 (Alaska 1965).

"Where it appears from the record that there is evidence from which fair-minded jurors could reach differing conclusions, the motion is properly denied."

*Mertz v. J. M. Covington Corp.,* 470 P. 2d 532, 536 (Alaska 1970).

The test for deciding a motion for a new trial is somewhat different from that for ruling on a motion for judgment n.o.v.[11] *Alaska State Housing Authority v. Vincent,* 396 P.2d 531, 534 (Alaska 1964). The proper test to be applied in reviewing a denial of a motion for a new trial based on the ground that the jury verdict was contrary to the weight of the evidence was announced by us in *Ahlstrom v. Cummings,* 388 P.2d 261, 262 (Alaska 1964). We stated:

"The matter of granting or refusing a new trial rests in the sound discretion of the trial judge. We shall not interfere with the exercise of his discretion except in the most exceptional circumstances and to prevent a miscarriage of justice. The circumstances which would require

10. After the evidence was presented, appellant moved, pursuant to Civil Rule 50(a), for a directed verdict.

Following the jury verdict and entry of judgment, appellant filed a motion pursuant to Civil Rules 50(b) and 59, for judgment n. o. v. or, in the alternative, for a new trial.

Civil Rule 50(b) provides that:

"Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the moving party may move not later than 10 days after the entry of judgment to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial."

Civil Rule 59(a) provides that:

"A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has

been a trial by jury or in an action tried without a jury, if required in the interest of justice. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

11. 6A Moore's Federal Practice ¶ 59.08[5] at 59–155–58 (2d ed. 1974) states that:

"As pointed out earlier in this discussion, a motion for a directed verdict or for judgment n. o. v. raises the legal sufficiency of the evidence, and is to be sharply distinguished from a motion for a new trial on the ground that the verdict is against the weight of the evidence. The latter motion is addressed to the sound discretion of the trial court, which may set aside the verdict as contrary to the preponderance of the evidence, although a directed verdict or judgment n. o. v. is not justified. As Judge Parker stated in *Aetna Casualty & Surety Co. v. Yeatts* [122 F.2d 350, 352–53 (4th Cir. 1941)]:

'On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of [sic] opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'"

our intervention do not exist here. From a review of the record we cannot say that evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust. On the contrary, we find that the issues which the jury were called upon to decide turned upon facts which were in dispute, and that there was clearly an evidentiary basis for the jury's decision." (footnotes omitted)

In other words, in reviewing a trial court's exercise of discretion upon a motion for new trial, we must examine the record and determine whether "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Ahlstrom v. Cummings, supra,* at 262. If we find that "there was an evidentiary basis for the jury's decision," then the denial of a new trial must be affirmed.[12] *Olson v. McRae* 389 P.2d 576, 577 (Alaska 1964).

Furthermore, in reviewing denial of motions for directed verdict, judgment n.o.v. or, in the alternative, for a new trial, the court must "view the evidence in the light most favorable to the party against whom the motions were made." *Mallonee v. Finch,* 413 P.2d 159, 160 (Alaska 1966).

We will first apply the foregoing to the facts of this case in order to determine whether the court erred in failing to grant appellant's motion for a directed verdict or judgment n.o.v.

Appellant presented several theories of liability at trial. However, on appeal appellant urges only two theories: that ARCO is liable for the accident under traditional concepts of supervision and control, and that jury instructions 29 and 32 require that ARCO be found liable.

With respect to the first theory, appellant has cited no cases in which a directed verdict was granted in favor of a plaintiff workman.[13] The majority of appellant's cases simply hold that a jury will be allowed to find a property owner liable for injuries sustained by an employee of an independent contractor where the jury finds that the property owner retained sufficient control over the work of the independent contractor.[14] No case is cited for the proposition that, under its given set of circumstances, a jury must so find.

The jury was instructed with respect to the liability of one who entrusts work to an independent contractor but who retains control of any part of the work.[15]

12. *In Mallonee v. Finch,* 413 P.2d 159, 162 (Alaska 1966), we stated:
"Unlike a motion for directed verdict or judgment n. o. v., this issue involves the trial judge's discretion. Upon those portions of the record referred to above, we are of the opinion that 'there was an evidentiary basis for the jury's decisions,' and therefore cannot find that the trial judge clearly abused his discretion in denying appellant's motion for a new trial." (footnotes omitted)

13. On the contrary, some resulted in summary judgment (the test for which would be quite similar to that for a directed verdict) against the plaintiff workman. *See, e. g., Deville v. Shell Oil Co.,* 366 F.2d 123 (9th Cir. 1966).

14. *See, e. g., Hobbs v. Mobil Oil Corp.,* 445 P.2d 933, 935 (Alaska 1968), where, in reversing a summary judgment in favor of the defendant owners of an oil platform, we stated:
"It is a question of fact for the jury . . . to determine whether the employer of an independent contractor retained sufficient control so as to make him liable.",

15. Instruction 25 reads as follows:
"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to employees of the independent contractor, which is caused by his failure to exercise his control with reasonable care.
In order for this rule to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions

In *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 934 (Alaska 1968), we stated the rationale for this rule:

> "The general rule is that the employer of an independent contractor is not responsible for the negligence of the latter. The rule is justified on the ground that since the employer of an independent contractor has no control over the prosecution of the work, it would be unjust to hold him liable for the torts of another whom he cannot direct. Following this line of reasoning it would appear that if the employer has retained an element of control over the work, he should be responsible for the harmful consequences of its performance as a concomitant of the control retained." (footnotes omitted)

With respect to appellant's argument that ARCO should have been found liable because it retained control and supervision of the site, we find that there was "room for diversity of opinion among reasonable men, in the exercise of reasonable judgment," *Bolden v. City of Kodiak*, 439 P.2d 796, 802 (Alaska 1968), and that, therefore, the court did not err in refusing to grant appellant's motions for a directed verdict or judgment n.o.v.[16]

Furthermore, in light of the testimony presented on the issue of control, we conclude that the court did not abuse its discretion in refusing to grant a new trial to appellant. It cannot be said that the evidence to support the verdict under the supervision and control theory is "so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Ahls-trom v. Cummings, supra* at 262. Rather, whether ARCO exercised supervision and control of the site was a question of fact for the jury to decide. Since there was clearly an evidentiary basis for the jury's decision, we shall not interfere with the court's exercise of its discretion.

Appellant next contends that, in light of jury instructions 29 and 32, the court was required to grant her motions for a directed verdict, or for judgment n.o.v. or, in the alternative, for a new trial.

Jury instruction 29 provided:

> "If you find that defendant Atlantic Richfield Company had several separate contractors working at the same time on the site where plaintiff's decedent was killed, you must find that defendant retained possession of the land in question."

Jury instruction 32 provided:

> "A possessor of land who entrusts to an independent contractor construction on a structure upon it, is subject to the same liability as though he had retained the work in his own hands to others on the land for physical harm caused to them by the unsafe condition of the structure while the possessor has retained possession of the land during the progress of the work. This rule has no application to injuries occurring while the land is turned over to the contractor and he is in exclusive possession of it."

We note first that jury instructions 29 and 32 constitute the law of the case because appellee failed to object to either instruction.[17] Thus, in resolving

---

or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his method of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

16. Evidence was presented which would have supported a finding that the ARCO representatives, Mr. Landis, and Mr. Wilken, neither had nor took responsibility for the design or safety of the shoring.

17. Where instructions to the jury are given on a definite theory of liability and the record discloses no objections thereto at trial and none is made thereto on appeal, the instructions, for purpose of review, become the law of the case. *Hagood v. Hall*, 211 Kan. 46, 505 P.2d 736, 739 (1973); *Smith v. Bassett*, 159 Kan. 128, 152 P.2d 794, 796 (1944); *Tilton v. Cowles Pub. Co.*, 76 Wash.2d 707,

the issue of whether appellant's motions should have been granted, we assume, without deciding, that these instructions correctly state the law.

"Site" is defined in the dictionary as "the local position of building, town, monument, or similar work either constructed or to be constructed especially in connection with its surroundings; a space of ground occupied or to be occupied by a building; land made suitable for building purposes by dividing into lots, laying out streets, or providing facilities." [18]

Since this definition is not dispositive, we must review the record in order to determine how the jury must have interpreted the term "site."

In determining the meaning of "site" we have considered several factors including ARCO's Exhibit 9, the testimony elicited from Mr. Landis by Mr. Cook, and the interchangeable use of certain words by the attorneys for both parties and by Mr. Landis. ARCO's Exhibit 9 is a diagram of the entire Prudhoe Bay camp. The exhibit, which illustrates the lay-out of the Prudhoe Bay camp, shows seven buildings connected with one another by a covered walkway. These buildings are in close proximity to one another and they share a common passageway. Thus, it is at least arguable that a reasonable person would use the word "site" to refer to the entire base camp.

The meaning of "site" is further clarified by the following exchange which took place between Mr. Landis and Mr. Cook, counsel for ARCO:

A. [Mr. Landis] Mr. Ralph Hunt was a representative of Metcalf & Eddy, who was the—who were the consulting design engineers for the majority of the base camp buildings there at Prudhoe Bay.

Q. [Mr. Cook] Was Mr. Hunt on the site up there all the time, or did he come and go?

A. He spent most of his time up there, but he did go out on breaks."

. . . . . .

Q. Do you recall what date the accident occurred at Prudhoe Bay, in which Mr. Sloan was killed?

A. It was on the—according to my book, it was on the 5th of August—

. . . . . .

Q. And was that your week to be on the site?

A. Yes, I was on the site at the time."

Finally, the record reveals that, on several occasions, Mr. Cook and Mr. Blair, attorneys for ARCO and Mrs. Sloan, respectively, and Mr. Landis, a construction engineer for ARCO at the time of Moses Sloan's death, used the words "site", "camp site", "construction site", and "jobsite" to refer to the area also known as the base camp. Furthermore, Mr. Cook, while questioning Mr. Landis, used the word "site" to describe the entire Prudhoe Bay camp.

Having closely examined the entire record and, in particular, the evidence described in the preceding paragraphs, we conclude that, at a minimum, "site" was used by the parties to describe all the buildings within the base camp, to wit, the generator building warehouse, sewage treatment building, crude oil topping plant, water treatment building, central building, automotive and welding shop, parking building and the covered walkway that connected all the buildings. We further conclude that the jury must also have so interpreted the word "site" in instruction 29.

Having defined "site" to include all the buildings within the base camp, we must now determine whether ARCO had several separate contractors working at the same time on the base camp buildings.

A review of the trial transcript reveals that at the time of the accident, Ramstad

459 P.2d 8, 15 (Wash.1969), *cert. denied,* 399 U.S. 927, 90 S.Ct. 2238, 26 L.Ed.2d 792 (1970); *Whipple v. Lambert,* 73 Wash.2d 952, 442 P.2d 266, 267 (1968).

18. Webster's Third New International Dictionary of the English Language Unabridged 2128 (1969).

Construction was not the only contractor working at the base camp site.

Mr. Landis, a construction engineer for Atlantic Richfield at the time of the accident, testified as follows:

"5 [number on a map of Prudhoe Bay] is buildings and foundations by Ramstad Construction. There were numerous buildings which they were going to put up. They did have the crude oil topping plant up, the pump station—or the pumping and other various facilities. A generator building, an automotive welding shop and a hangar. And they were doing the foundation work for all the other buildings there. . . . Buildings and covered walkways by Burgess Construction in the same area. Burgess Construction was building a water treatment plant, sewage plant, a warehouse and a vehicle storage building. Now, they were just putting up the buildings themselves on the foundations that were there.

Q. [Mr. Cook] Okay. Now, was there—were there various contractors doing this work?

A. Yes, there was.

Q. . . . Can you recall the names of the contractors who performed these various contracts here?

A. All of the buildings up there were put on pilings—or practically all of them. There was an exception or 2. And so we had drilling contractors in there that drilled holes and we'd take these wooden piles and put them down in the holes and freeze them in—in place. So there were several drilling contractors doing this. Do you want the names of them?

Q. Right.

A. Around that time there was. . . .

Q. Well, I just want the principal ones, you don't have to. . . .

A. Yes. Well, there was Alaska Diamond Drilling, Hatch Drilling, Polar Oil Services, Penn-Jersey, Mettler Drilling— these were all drilling outfits that were in that area there to drill—drilling pile holes and so forth. There was Ramstad Construction on the building foundations, basically. Neidermeyer and Martin came in to build the central building. There was Spruce Construction who did quite a bit of the gravel work. Burgess Construction, who did both gravel work and some structural building work. Frontier Rock and Gravel—Rock and Sand, I guess it is, and they did gravel work. There was Wagley Construction, who worked more with the drill rigs at that time, but they did some work around the base camp. Then we had a National Mechanical—came in there to do mechanical work on the crude oil topping building.

.    .    .    .    .    .

Q. And were all these projects being overseen during 1969 by you and Mr. Wilkins?

A. During that year, yes. We were overseeing all of these projects."

During cross-examination, Mr. Landis testified as follows:

"Q. Who was the contractor working on the crude oil topping plant? Or would it be contractors?

A. Well, to start with, the drilling of the pile holes initially was done by, I believe, Alaska Diamond Drill and I believe Polar Oil Services did some drilling on it. In the whole complex, we had—well we may have had Penn-Jersey in there, I'm not sure. We had several drilling contractors.

.    .    .    .    .    .

Q. Well, either Polar or Diamond or Penn-Jersey or. . . .

A. Yes.

Q. . . . one of them would have drilled the holes for the pilings on the automotive shop?

A. Oh, yes. Yes.

.    .    .    .    .    .

Q. Yeah, I was wondering who else would have been on the crude oil topping plant?

A. Okay. Then, Ramstad put in the—worked on the flooring, and so forth. They had National Mechanical working on the mechanical part of it. I don't recall who the contractor was who built the storage tanks, I just don't remember which contractor it was. And I'm not sure which electrical contractor was doing electrical work at that time. I don't recall.

. . . . . .

Q. There were, as I understand it, a number of contractors on the project, one of whom was Ramstad, is that right?

A. Yes."

Our review of the evidence reveals that Mr. Landis' testimony that more than one contractor was working at the same time on the base camp buildings was not contradicted by any other witness. Thus, since more than one contractor was working at the site it is apparent that under Instruction 29 ARCO retained possession of the base camp.

■ In order to find liability under instruction 32, the jury must have found both that ARCO retained possession during the progress of the work and that physical harm was caused by the unsafe condition of a structure. Instruction 32 is based upon the Restatement (Second) of Torts § 422.[19] This section does not make possessors of land strictly liable for injuries suffered by employees of independent contrac-

tors. In order to establish liability, the injured party must prove that the independent contractor acted in a negligent manner.[20]

As we have already stated, in light of the evidence, no issue of fact was presented regarding whether ARCO was in possession of the site. Since there was more than one contractor working at the site at one time, ARCO retained possession.

However, as previously noted, under instructions 29 and 32, ARCO is not strictly liable merely because it remained in possession of the site. In order to establish liability, appellant was required to prove that Ramstad negligently poured the cement.

■ On appeal, appellant appears to be relying on the doctrine of res ipsa loquitur to prove that Ramstad was negligent.[21]

In *Crawford v. Rogers,* 406 P.2d 189, 193 (Alaska 1965), we said concerning res ipsa loquitur:

"As a rule of law in an action involving an accident where a claim of negligence is made, it permits a jury, on the basis of experience or common knowledge, to infer negligence from the mere occurrence of the accident itself. The jury is permitted to conclude that such an accident would not ordinarily occur unless someone had been negligent."

And, in *Ferrell v. Baxter,* 484 P.2d 250, 258 (Alaska 1971), quoting from *Guanzon v. Kalamau,* 48 Haw. 330, 402 P.2d 289, 291 (1965), we noted:

"The doctrine, where applicable, is a procedural device which operates to shift

19. Restatement (Second) of Torts § 422 (1965) provides:

"A possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same liability as though he had retained the work in his own hands to others on or outside of the land for physical harm caused to them by the unsafe condition of the structure

(a) while the possessor has retained possession of the land during the progress of the work, or

(b) after he has resumed possession of the land upon its completion."

20. *See* the comments to Restatement (Second) of Torts § 422 (1965). All of the examples cited therein speak in terms of negligence. There is no mention of strict liability.

21. Res ipsa loquitur means "the thing speaks for itself." Black's Law Dictionary 1470 (rev. 4th ed. 1968). Normally, this doctrine is utilized only in cases with incomplete factual descriptions. *Evans v. Buchner,* 386 P.2d 836, 837 (Alaska 1963).

the burden of going forward with the evidence to the defendant without relieving plaintiff of the burden of proof. It relieves the plaintiff from showing any particular acts of negligence and places on the defendant the burden of explaining that the accident did not occur from want of care on his part." (citation omitted)

█ Generally, the jury is permitted, but not compelled, to draw an inference of negligence from the facts of the case.[22] However, as Professor Prosser points out,

"In all such jurisdictions . . . there may be occasional cases . . . where the inference of negligence is so clear that no reasonable man could fail to accept it; and in such cases, if the defendant offers no explanation, a verdict should be directed for the plaintiff." [23]

█ We conclude that this is a proper case for the application of the doctrine of res ipsa loquitur because the accident was one which ordinarily does not happen in the absence of negligence and because the cement pouring operation was in the exclusive control of Ramstad. Further, since all of the testimony tended to prove that Ramstad was negligent, and there was no explanation for the collapse of the floor that did not involve some negligence, we hold that the jury could not reasonably have found that Ramstad was not negligent.

As discussed above, under jury instruction 32 ARCO is vicariously liable for the negligence of Ramstad. Thus, we conclude

that appellant is entitled to a judgment notwithstanding the verdict on the issue of negligence, because the evidence, viewed in light of the instructions, is such that fair-minded jurors could only find ARCO negligent. The trial transcript unequivocally reveals that ARCO was in possession of the camp site and therefore responsible for the negligence of its employees and those of Ramstad. All of the testimony tended to prove negligence on the part of Ramstad, and there was no evidence indicating non-negligence in the pouring of the cement or the construction of the shoring that was not refuted by the fact that the floor collapsed. In short, the evidence, the instructions, and the inference of res ipsa loquitur, required a finding of negligence on the part of ARCO.

█ Now we must consider the defense of contributory negligence raised by ARCO before the trial court. First, we note that the court ruled that the evidence presented a jury question with respect to whether Sloan was contributorily negligent. The jury returned a general verdict, which apparently was not based on a finding of contributory negligence, in favor of ARCO.[24] We cannot be certain whether the jury would have considered Sloan to have been negligent if it had reached that question. Accordingly, although ARCO is liable for the negligence of Ramstad, ARCO still might be able to prove that Sloan was also negligent. Therefore, we reverse the judgment and remand this case to the superior court for further proceed-

22. *Eaton Fruit Co. v. California Spray-Chemical Corp.*, 103 Ariz. 461, 445 P.2d 437, 440–41 (1968); *Davis v. Memorial Hosp.*, 58 Cal.2d 815, 26 Cal.Rptr. 633, 634, 376 P.2d 561, 562 (1962); *Younger v. Webster*, 9 Wash.App. 877, 510 P.2d 1182, 1186 (1973).

23. W. Prosser, Torts, § 40 at 229–30 (4th ed. 1971).

24. Under jury instruction 10, the jury might not have had occasion to consider the question of whether Sloan had been contributorily negligent:

"Defendant has alleged that decedent Moses C. Sloan was contributorily negligent.

The question of decedent's contributory negligence is a matter of defense, to be litigated, if at all, only after the plaintiff has proved the elements of his case, including the defendant's duty and breach thereof.

You, the jury, must determine whether or not the defendant was negligent before reaching the issue of contributory negligence. If you find that the defendant was not negligent you need not concern yourselves with this issue of contributory negligence.

If you find that defendant was negligent, then the issue of contributory negligence must next be resolved by you."

ings on the issue of whether Sloan was negligent. Under our recent decision in *Kaatz v. State,* 540 P.2d 1037, (Alaska 1975), a finding of contributory negligence on the part of Sloan would not necessarily bar recovery by appellant. By virtue of the doctrine of comparative negligence, which we have adopted in *Kaatz,* the recovery of damages in this case will depend on the respective degrees of negligence of Sloan and ARCO.

Since ARCO is no longer the prevailing party, we reverse the award of attorney's fees without consideration of appellant's contention that an insurance company should not be able to collect attorney's fees under Rule 82 in a case such as this.

Reversed and remanded.