Karl **BACHNER** and William G. Jones, Individually and doing business as Bachner-Northwest, a joint venture, Appellants,

v.

Kenneth **RICH** and Mary Rich, Appellees.

No. 2309.

Supreme Court of Alaska.

July 16, 1976.

On Rehearing Aug. 27, 1976.

---

Keith E. Brown and Sanford M. Gibbs, of Hagans, Smith & Brown, Anchorage, for appellants.

L. Ames Luce, of Kelly & Luce, Anchorage, Theodore R. Dunn, of Matthews, Dunn & Baily, Anchorage, for appellee.

OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and BURKE, JJ.

RABINOWITZ, Chief Justice.

This is an appeal from the judgment of the superior court in an action for personal injuries. After trial by jury, appellee Kenneth Rich was awarded damages of $450,000, and appellee Mary Rich received a verdict of $50,000. Following the superior court's denial of their motion for a new trial and motion for judgment notwith-

standing the verdict, appellants filed a timely notice of appeal.

On July 28, 1970, Kenneth Rich was employed as a "taper" by Totem Painting and Decorating Company. A taper covers and conceals the joints between abutting panels of sheetrock by placing a tape and taping compound over the joints. After taping, the covered joints are "floated" to produce a smooth surface prior to painting.

Rich was working in McGrath, Alaska, on a project involving the construction of a new gymnasium and additional classrooms for the village school. Appellants Bachner and Jones, doing business as Bachner-Northwest, were the general contractors on the job. Totem had been chosen as subcontractor for the painting and taping work.

The contract between Bachner-Northwest and Totem provided that Totem would supply its own equipment, but that Bachner-Northwest would pay for the transportation of that equipment to the job site. However, it was later agreed that Bachner-Northwest would provide the scaffolding to be used on the job, in an apparent attempt to save Bachner-Northwest the cost of transporting Totem's scaffolding to McGrath. Donald Jones, Bachner-Northwest's job foreman, along with several other employees of Bachner-Northwest, constructed a rolling tubular pole scaffold for the use of those employed on the McGrath building project. Jones assumed that everyone on the job would be using the scaffold, and was familiar with the manner in which scaffolding of this type was customarily used for taping purposes.

The scaffold constructed by Jones was just under six feet high. Its principal parts (as illustrated by the photograph appearing in the appendix to this opinion) were: (A) two *hulls*—end support members; (B) two *bearers*—the upper portions of the hulls; (C) *diagonal braces*—stabilizing braces which connect the two hulls; (D) three *ledgers*—support beams spanning the two bearers; (E) *planking*—boards placed on top of the ledgers to form the stage or work surface; and (F) *wheels*—equipped with locks designed to prevent movement of the scaffold when engaged.

Jones "cleated" the working surface by driving one 16-penny nail into the bottom of each of the three ledgers, then bending the nails around their respective bearers.

On July 23, 1970, Kenneth Rich began working on the mezzanine area of the gymnasium, using the scaffold provided by Bachner-Northwest. He continued to work in that area until July 28, 1970. On that day he apparently completed the taping process and was floating the tape joints in the ceiling and upper portions of the walls.

At approximately 11:50 a.m. Donald Jones heard a "thud" from the gymnasium area. After a brief investigation, Jones assumed that the noise had been caused by a worker dropping tools or materials. When Rich did not arrive for the usual noon lunch break, a search was initiated by Jones and Robert Maxim. Rich was found lying unconscious in the mezzanine area, on his back, with his arms outspread, approximately two feet from the scaffold he had been using to perform his work. The scaffold was in a "scissored" position with two of the three ledgers no longer supported by a bearer at one end. The 16-penny nails, which Jones had driven into the bottom of the ledgers for cleating, were bent flat, and a number of 8-penny nails used to attach the planking to the ledgers had partially pulled loose. The planking or working surface was at an angle where the two ledgers were no longer supported by the bearer.

A half-full five gallon bucket of taping compound was found on the floor, on its side, six feet from the scaffolding. There was evidence that it had rolled to its final resting place. A trowel was also found on the floor, near the bucket of taping compound.

Kenneth Rich is unable to recall what happened immediately prior to his being

found by Jones and Maxim. The last thing he remembers is taking a break for a cup of coffee at approximately 11:20 a.m.

Rich, accompanied by Maxim, was flown to Anchorage and taken to the emergency room at Providence Hospital where he was first seen by Dr. William F. Mills, an orthopedic surgeon. Rich appeared somnolent, uncoordinated, and unable to provide a thorough history. He was observed to thrash about on the examination table, appeared unable to extrude his tongue well, and exhibited a positive Babinski sign in the right foot, indicating injury to the spine or brain. Dr. Mills diagnosed Rich as having sustained a contusion of the left frontal or temporal area of the brain and a possible strain of the lumbo-sacral spine. No external signs of physical injury were observed. However, Dr. Mills stated that the lack of such external injury was not inconsistent with his diagnosis, as brain injury from external trauma commonly occurs without physical markings on the body surface.

Dr. Perry A. Mead, a neurosurgeon, assumed the care and treatment of Kenneth Rich. When first seen by Dr. Mead, Rich appeared to be confused, showing signs of right side weakness and evidencing an abnormal reflex in his right foot. Dr. Mead made a tentative diagnosis of contusion of the left frontal temporal region of the brain and admitted Rich to Providence Hospital. During the first three days of hospitalization, Rich was incoherent and unable to recognize his wife. Upon discharge four days later, he still had many of the same signs and symptoms which were in evidence when he had been admitted to the hospital. Dr. Mead's diagnosis at discharge was contusion of the frontal parietal and frontal temporal portions of the brain. On August 4, 1970, Dr. Mead conducted an examination at his office, finding tenderness in Rich's right ribs. Rich also demonstrated an inability to maintain his balance and Dr. Mead noted that his right hand was not functioning properly. Rich was unable to read, could not perform coordination drills with either hand, and would say one thing when he meant another. Dr. Mead further observed abnormal reflexes in the lower limbs on the right hand side, a loss of sense of reality, and a manner of breathing indicating contusion and swelling of the brain.

Following his release from the hospital Kenneth Rich was unable to care for himself, requiring constant supervision, assistance and direction. It was approximately one month before he was able to undertake even the care of his personal hygiene. When he attempted to talk, he had difficulty pronouncing words and was observed to drool like a small infant. In the years that followed, he made some limited progress through the use of physical, psychiatric and vocational therapy. He did, however, undergo a pronounced personality change and is required to take Valium, Dilantin and Trompiz on a daily basis. According to his doctor, he suffers from the residual effects of a contusion of the left frontal temporal area of the brain, is unemployable and will remain so for the rest of his life. The prognosis for improvement is zero.

Prior to trial Rich was examined by an expert employed by Bachner-Northwest, Dr. Richard Mullins, a Seattle neurologist. Dr. Mullins concluded, from the diffused nature of the injury and history of Rich's symptoms, that Rich had suffered from a cerebral vascular accident or thrombosis stroke. His conclusion was partially based on the fact that it was difficult for a person to have sustained as massive an injury to the frontal lobe of the brain as Rich claimed without some external sign of injury. However, Dr. Mullins testified that severe contusion of the brain could occur without external evidence of injury. Dr. Mullins found Rich to be aphasic, forgetful, unable to give a coherent history, unable to rapidly tap his right foot, unable to coordinate the movements of his right hand, arm and foot, and suffering from headaches. The deep reflexes on the right

side of his body were increased and the right superficial abdominal reflex was absent. All of these signs and symptoms were consistent with contusion of the brain according to Dr. Mullins. Dr. Mullins also found no indication in Rich's prior history of headaches, arterial sclerosis, high blood pressure, cardiovascular disease or other related disorders, which are often present in a patient suffering a thrombosis stroke. He further admitted that a thrombosis stroke is rare in a patient under 40. At the time of the incident Rich was 37 years of age. Dr. Mullins also stated that a high percentage of thrombosis stroke patients suffer stroke recurrence in a short period of time and have myocardial infarctions, of which there was no evidence in Rich's case.

Appellants' first claim of error concerns the superior court's refusal to direct a verdict in their favor. Rich's theory of liability was that appellant owed him a duty to exercise reasonable care to ensure the scaffold was safe for its foreseeable use, and that appellant breached that duty actually and proximately causing his injuries.[1] At the close of appellees' case, appellants moved for a directed verdict on the issue of liability, claiming that there was no evidence from which fair-minded people could conclude that Kenneth Rich fell from the scaffold, or that such a fall was proximately caused by any act or omission on the part of Bachner-North-

west. Noting the absence of any external signs of injury and the lack of any witness who could testify that he had observed Kenneth Rich fall from the scaffold, appellants argued that the medical evidence presented by appellees was equally consistent with the diagnosis of preexisting lesion or cerebral vascular accident, as opposed to a contusion caused by an external blow.

In *Teller v. Anchorage Asphalt Paving Co., Inc.,* 545 P.2d 177, 180 (Alaska 1976), we recently said:

> In reviewing a lower court's rulings pertaining to motions for directed verdict we are required to view the evidence in the light most favorable to the non-moving party, and to afford him the benefit of all inferences which the evidence fairly supports.[2]

The moving party is entitled to a directed verdict only if it can be said that fair-minded jurors in the exercise of reasonable judgment could reach but one conclusion on the issue in controversy. If such reasonable persons could reach differing conclusions, a jury question or question of fact exists, and the motion for a directed verdict should be denied.[3] Applying these principles to the instant case, we conclude that the superior court properly denied appellants' motion for a directed verdict.

Reasonable jurors could infer, from the evidence presented, that the scaffold scissored and collapsed, causing Rich

---

1. Section 392 of the Restatement (Second) of Torts (1965) provides:

 One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied.

 (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

 (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

2. Citing *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87 (Alaska 1974); *Breitkreutz v. Baker,* 514 P.2d 17 (Alaska 1973); *City of Fairbanks v. Nesbett,* 432 P.2d 607 (Alaska 1967); *Howarth v. Pfeifer,* 423 P.2d 680 (Alaska 1967); *Otis Elevator Co. v. McLaney,* 406 P.2d 7 (Alaska 1965).

3. *Teller v. Anchorage Asphalt Paving Co., Inc.,* 545 P.2d 177 (Alaska 1976). *See also City of Fairbanks v. Nesbett,* 432 P.2d 607 (Alaska 1967); *Bertram v. Harris,* 423 P.2d 909 (Alaska 1967); *National Bank of Alaska v. McHugh,* 416 P.2d 239 (Alaska 1966); *Mallonee v. Finch,* 413 P.2d 159 (Alaska 1966); *Otis Elevator Co. v. McLaney,* 406 P.2d 7 (Alaska 1965); *Saxton v. Harris,* 395 P.2d 71 (Alaska 1964); *McCoy v. Alaska Brick Co.,* 389 P.2d 1009 (Alaska 1964).

to fall, and that these events occurred as a result of a failure on the part of Bachner-Northwest's employees to exercise ordinary care in the construction of the scaffold, given their knowledge of its intended use and the requirements of the taping trade. The evidence of a loud "thud", heard shortly before Rich was found, the condition of the scaffold, the position of his body, the position of the bucket, and the evidence that all his symptoms developed after the incident in McGrath, when viewed in the light most favorable to appellees, would permit reasonable people to differ on whether the alleged negligence of appellants was a proximate cause of Rich's injuries. Whether his injuries were a proximate result of a fall and traumatic injury or the result of a stroke therefore presented a jury question.

At the conclusion of the evidence, appellees moved for a directed verdict on the issue of contributory negligence.[4] Appellees' motion was based on their contention that contributory negligence was not a defense to a violation of the Alaska General Safety Code, but that even if it were, there was insufficient evidence from which a jury could reasonably conclude that Kenneth Rich had been contributorily negligent.

The superior court granted the motion, directing a verdict against Bachner-Northwest and instructing Bachner's counsel not to argue the subject of Rich's purported contributory negligence to the jury. In reaching his decision, the judge stated:

> I have looked through all the testimony and I fail to see where any evidence whatever having to do with contributory negligence was ever raised.

■ Appellants take the position that the superior court erred in granting a directed verdict with respect to the issue of contributory negligence. In reviewing this question, we must again utilize the standard set forth in *Teller v. Anchorage Asphalt Paving Co., Inc.*, 545 P.2d 177 (Alaska 1976). Thus, the evidence on the issue of contributory negligence is viewed in the light most favorable to appellants, and they are afforded the benefit of all inferences which the evidence fairly supports. Viewing the evidence in this light, this court will sustain the directed verdict only if it can be said that there was no evidence from which reasonable men could infer that Kenneth Rich failed to exercise due care for his own safety.[5]

Study of the record reveals that Bachner-Northwest adduced testimony that Rich customarily left the wheels of the scaffold unlocked and that Rich moved the scaffold in the course of his work by standing upon it and pushing against the wall or ceiling. Although there was testimony that this practice of "walking" the scaffold was customary and widespread in the trade, there was conflicting testimony that there was no customary trade practice of "walking" and that utilization of the technique of "walking" was a matter of individual discretion. Appellees elicited testimony that use of the "walking" technique was essential to maintain a satisfactory rate of production, because a taper would have to relocate the scaffold every 30 to 90 seconds. However, the jury had before it contradictory evidence that relocation would be required once every 10 to 20 minutes. Moreover, expert testimony was offered by Bachner-Northwest that safety practices established in the construction industry required that a taper dismount his scaffold and move it by applying pressure to its base. This expert further testified that good safety practice requires that all four wheels be locked when the scaffold is in

4. This case was tried prior to our decision in *Kaatz v. State*, 540 P.2d 1037 (Alaska 1975). There we abandoned the doctrine of contributory negligence in favor of a system of pure comparative negligence. At the time of the instant case, any negligence on the part of Rich which contributed as a proximate cause of his injuries would have operated as a complete bar to appellees' claims against appellants.

5. *See also Wilson v. Sibert*, 535 P.2d 1034, 1036 (Alaska 1975).

use. Additionally, there was testimony that Kenneth Rich was found lying in a state of unconsciousness next to the scaffold shortly after the foreman had heard a loud "thud" coming from the gymnasium. At the time of this discovery the wheels of the scaffold were unlocked.

In our view, the foregoing evidence is sufficient to support a reasonable inference that Rich had attempted to maneuver the scaffold by "walking" it, that these efforts caused the scaffold to scissor and collapse, throwing Rich to the gymnasium floor, and that this conduct therefore created an unreasonable risk of harm to Rich and constituted contributory negligence. Thus, appellants were entitled to have the jury instructed on this theory of contributory negligence, and it was error for the superior court to grant a directed verdict against Bachner-Northwest on the issue of Kenneth Rich's contributory negligence.[6] In reaching this conclusion, we reject three lines of argument which appellees advance in support of their position that they were entitled to a directed verdict on the issue of Kenneth Rich's purported contributory negligence.

Appellees contend that in the absence of direct evidence establishing the events of the morning in question Kenneth Rich was entitled to a presumption of due care which, when considered with the other evidence produced, warranted a directed verdict on the issue of contributory negligence. In the instant case, however, there was sufficient evidence of contributory

negligence to take the issue to the jury, rendering inappropriate reliance on any presumption of due care.[7]

Appellees also argue that, assuming Rich was engaged in the practice of "walking" at the time of the accident, no reasonable man would find such conduct unreasonably dangerous under the particular circumstances of the case at bar. Emphasis is placed upon testimony in the record to the effect that a taper working alone could not perform efficiently without utilizing this method of locomotion, that there was minimal risk of harm in using this technique on a scaffold of this size, and that the alternative practice of dismounting the scaffold prior to movement would have also entailed a risk of injury since there was no ladder affixed to the scaffold. Our prior discussion pertaining to the evidentiary basis for submitting to the jury the question of Kenneth Rich's contributory negligence reveals that there was testimony contradictory to much of the foregoing evidence. Thus, we conclude there was sufficient evidence to raise a jury question as to whether Rich's conduct was reasonable under the circumstances.

Finally, appellees contend that contributory negligence should, as a matter of law, be unavailable as a defense in a negligence action predicated on a violation of the state's General Safety Code. The thrust of appellees' argument is that the defense should be denied because the injured employee is rarely able to protect himself from unsafe working practices;

6. Bachner-Northwest also raises the argument that there was evidence tending to show that Rich had dismantled and reassembled the scaffold, and that therefore there was evidence of contributory negligence. Until this appeal the question of dismantling had been treated as one of proximate cause. During discovery, prior to trial, the only claim of contributory negligence advanced by Bachner-Northwest related to Rich's practice of "walking" the scaffold. Likewise, during the trial, the only argument concerning contributory negligence related to Rich's method of locomotion. We consider the is-

sue to therefore have been waived. *See Sumner Dev. Corp. v. Shivers*, 517 P.2d 757 (Alaska 1974); *Moran v. Holman*, 501 P.2d 769 (Alaska 1972); *Padgett v. Theus*, 484 P.2d 697 (Alaska 1971). We do note, however, that there was no evidence that the scaffold was reassembled in any condition other than that which it was in when originally supplied or that Rich failed to exercise due care in any dismantling or reassembly that might have occurred.

7. *Cf. State v. Phillips*, 470 P.2d 266, 269 (Alaska 1970).

because the employer is better able to bear the risks and distribute the losses attributable to unsafe working conditions; and because the legislative intent behind the Code would be frustrated if the defense of contributory negligence were allowed. This contention we find unpersuasive, largely for the reasons set forth by Judge Plummer in *Krall v. Royal Inns of America, Inc.*, 374 F.Supp. 146 (D.Alaska 1973).

Rich's theory of liability was that Bachner-Northwest owed a duty to exercise reasonable care in the construction and deployment of the scaffold. Appellant next asserts that the superior court erred in instructing the jury that the Alaska Safety Code established that standard of care by which their liability was to be determined, and that a violation of the Code was negligence as a matter of law.[8]

8. In regard to the Safety Code, the superior court gave the following instructions to the jury:

> *Instruction No. 20* (in part):
> If you find that the defendant violated the provisions of the Alaska General Safety Code with respect to the construction or maintenance of scaffolding, you must find the defendants negligent as a matter of law. You should then consider whether this violation of the Alaska General Safety Code proximately caused injury to Kenneth and Mary Rich. If that finding is in the affirmative, you should award damages to each plaintiff according to the court's instructions.
>
> *Instruction No. 21:* In order for you to determine whether there has been a violation of the Alaska General Safety Code, you must find that the defendant failed to construct, erect or maintain the scaffold in a manner contemplated by the code.
>
> It is your duty to determine what manner of 'cleating' the Code requires for this particular type of scaffolding and if the method used by the defendant met that requirement.
>
> If you should find that the defendant did not meet the requirements of the code, then you shall find that the defendant was negligent.
>
> If you should so find, then you must then determine if such negligence was the proximate cause of the · plaintiff's injuries, if any.

The court attached to its written instructions copies of the following provisions of law:

ALASKA STATUTES:

*A.S. Sec. 18.60.010.* Legislative Intent.

(a) The legislature finds that preventable accidents are the leading cause of death in the state, that accidents cause nearly one-fourth of all deaths of the white race in the state and as much as 82 percent of all deaths in certain age groups; that the proporation of accidental deaths to all deaths is three times as high in the state as in other parts of the United States where intensive accident prevention campaigns are conducted; and that an unknown but proportionately as great a rate of nonfatal accidents is sustained in the state.

(b) For these reasons it is found and declared necessary to undertake a program to reduce the incidence of preventable accidents in the State (Section 2 ch. 109 SLA 1955) [since amended]

*A.S. Sec. 18.60.020.* Rules and Regulations. The Department of Labor may issue the orders, rules and regulations necessary to carry out the purposes of Sections 10–100 of this chapter. (Section 4 ch. 109 SLA 1955)

*A.S. Sec. 18.60.075.* Safe Employment. An employer shall (1) furnish employment which is reasonably safe; (2) furnish and use safety devices and safeguards; (3) adopt and use methods and processes reasonably adequate to render the employment or place of employment reasonably safe; and (4) do every other thing reasonably necessary to protect the life, health, safety and welfare of employees. (Section 43–2–21 ACLA 1949; am Sec. 3 ch. 148 SLA 1957)

*A.S. Sec. 18.60.105.* Definitions. As used in Sections 10–100 of this chapter 'safe' or 'safety', as applied to an employment or to a place of employment, includes conditions and methods of sanitation and hygiene reasonably necessary for the protection of life, health, and safety and welfare of employees. (Sections 43–2–21 ACLA 1949; am Section 3 ch 148 SLA 1957)

Chapter I of the General Safety Code of the State of Alaska, Department of Labor, revised June, 1969:

*300–01 Scope*—The requirements of this code shall apply to the installation, erection or construction, use, maintenance and removal of all protective equipment, temporary facilities, safety devices, safeguards and methods used and employed in connection with all demolition, building and other construction work and all operations pertaining thereto and to the production, operation and use of industrial facilities.

*300–03 Definitions*—The word 'shall' where used, is to be understood as 'mandatory.'

Resolution of this issue requires a review of our decision which adopted the negligence per se rule as well as discussion of the applicability of the rule to the case at bar. In *Ferrell v. Baxter*, 484 P.2d 250 (Alaska 1971), this court followed the rules set forth in Restatement (Second) of Torts §§ 286, 288A and 288A (1965), in upholding the trial court's adoption of certain traffic regulations, found at 13 A.A.C. §§ 96 and 104.31, as applicable standards of reasonable behavior displacing common law negligence. Thus, in *Ferrell*, we held that an unexcused violation of a statewide administrative regulation, adopted pursuant to legislative authority, was negligence per se. Although *Ferrell* and all our subsequent decisions treating the doctrine of negligence per se dealt with the effect to be given to violations of traffic statutes or regulations, we are not persuaded that the doctrine of negligence per se should be limited to instances of violations of traffic statutes or regulations.[9]

The Restatement sections upon which our decision in *Ferrell* was grounded are not limited to traffic violations. Admittedly, in *Ferrell*, we stated that the adoption of the rule of negligence per se was particularly appropriate in cases involving the violation of a traffic ordinance or statute. In this regard, Justice Connor, writing for the court, said:

> Traffic rules have always been violated and injuries sustained as a result. This practice will undoubtedly continue whether or not civil liabilities are imposed. But people must be able to govern their affairs according to known standards.
>
> . . . . .
>
> Clarity, certainty, and justice are the goals we seek. It is certainly fair to require all drivers, who must be tested on these traffic laws and regulations before they may obtain driver's licenses, to know and obey the rules of the road.[10]

■ We think the same considerations which led us to apply the negligence per se rule in instances of violations of traffic statutes and regulations require that we apply the doctrine here. In this regard, we note that our prior decisions establish that the trial judge is vested with discretion[11]

The term 'safety factor' as used herein shall mean the ratio between the ultimate breaking strength and allowable safe unit working stresses of the material, structure or device. The term 'safety factor of five (5)' means that the material, structure, or device shall be constructed of such strength that the normal imposed load will be one-fifth ($\frac{1}{5}$) the ultimate breaking load. Other 'safety factors' appearing herein shall apply in similar manner. Standard textbooks may be used in determining the strength of materials except as herein provided.

Chapter XIX—SCAFFOLDS—of the General Safety Code of the State of Alaska, Department of Labor, revised June, 1969; 318-321 *Plasters' and Decorators' Inside Scaffolds*—Lathers', Plasterers', and Decorators' inside scaffolds shall be constructed in general accordance with the requirements for pole scaffolds.

*318-108*—All tubular pole scaffolds shall be designed for the particular loads they are to support with a factor of safety of four (4) and sufficiently braced to insure strength and rigidity.

*318-119*—Walkway planks shall be cleated to prevent planks slipping on metal bearers.

9. Because of the fact that our prior decisions happened to involve violations of traffic statutes or regulations, Bachner-Northwest argues that the doctrine of negligence per se does not extend to a violation of other state laws.

The prior decisions referred to here are *Clabaugh v. Bottcher*, 545 P.2d 172 (Alaska 1976); *Breitkreutz v. Baker*, 514 P.2d 17 (Alaska 1973); *Fruit v. Schreiner*, 502 P.2d 133 (Alaska 1972); *Lopez v. Bowen*, 495 P.2d 64 (Alaska 1972); *Ferrell v. Baxter*, 484 P.2d 250 (Alaska 1971).

10. *Ferrell v. Baxter*, 484 P.2d 250, 262-63 (Alaska 1971).

11. In regard to the trial court's discretion, we said, in part, in *Ferrell* that:

The fear that obscure or antiquated laws may be utilized to trap the unwary should prove groundless . . . . In the first place the court will be free under § 286, *supra*, to refuse to adopt such a law as the standard of a reasonable man.

in determining, as a matter of law, whether or not to adopt the legislative enactment or administrative regulation as the appropriate standard of care.[12]

The legislature has directed that an employer shall furnish safety devices and safeguards and shall do "every other thing reasonably necessary to protect the life, health, safety and welfare of employees." The Department of Labor has more precisely defined these obligations, by means of a code of standards applicable to those who engage in business or conduct which poses a risk of injury.[13] It is not unreasonable to require that contractors be familiar with the laws of this state which set the minimum acceptable standards for safety. Just as the automobile driver must know and obey the rules of the road, the contractor must know and obey the rules of his trade.

Subsequent to publication of *Ferrell*, this court, in *Breitkreutz v. Baker*, 514 P.2d 17, 20–24 (Alaska 1973), attempted to further define the criteria the trial judge should consider in deciding whether to adopt the legislative enactment of administrative regulation as the substitute standard of care. It has come to our attention that *Breitkreutz* has generated some confusion among the trial bench and practicing bar concerning the relevant criteria to be employed by the trial judge in determining whether to adopt or reject a legislative or

administrative determination as a substituted standard of care.

In *Breitkreutz*, we cited with approval the decision in *Lester v. John R. Jurgensen Co.*, 400 F.2d 393, 396 (6th Cir. 1968), where the court said in part:

> . . . when a statute expresses a rule of conduct in general or abstract terms negligence *per se* has no application and . . . in such a case liability is determined by the usual test of reasonable care.

Thus, in *Breitkreutz*, we affirmed the superior court's refusal to adopt as the controlling standard an administrative regulation directing drivers not to drive at a speed "greater than is reasonable and prudent." Of particular significance is that in *Breitkreutz*[14] we cited with approval *Eisenhuth v. Moneyhon*, 161 Ohio St. 367, 119 N.E.2d 440, 443–44 (1954). In *Eisenhuth*, the Supreme Court of Ohio articulated the relevant criteria for adoption or rejection of the legislative enactment or administrative regulation in the following manner:

> The determination whether any legislative enactment prescribes a specific course of conduct, the violation of which is negligence per se, or only a rule of conduct, compliance with which is to be tested by the conduct of a reasonably prudent person, often presents a problem

484 P.2d 250, 264 (Alaska 1971), citing Restatement (Second) of Torts § 286 comment *d* and W. Prosser, Law of Torts § 35, at 201–02 (3d ed. 1964). ·

*See also* our recent opinion in *McLinn v. Kodiak Elec. Ass'n*, 546 P.2d 1305, 1314 (Alaska 1976), where this court recognized that a decision not to adopt a regulatory standard may be justified in the circumstance "[w]here a party's infraction is due to innocent ignorance of the operative facts which make the statute or regulation applicable."

12. Once the legislative enactment or administrative regulation is adopted as the applicable standard of care, the role of the trial court is to then determine whether there was sufficient evidence from which a jury could reasonably infer that the statute or regulation

was violated and whether there was sufficient evidence of excuse to warrant submission of this latter issue to the jury. Similarly, if jury issues are determined to exist as to either, or both, of these issues, then it becomes the jury's task, under appropriate instructions, to resolve such factual issues.

13. Subsequent to the accident in this case, the legislature reaffirmed that the employer's statutory duties extended to compliance with the Code, by amending AS 18.60.075(a) to read in part:

> An employer shall do everything necessary to protect the life, health and safety of employees including:
>
> (1) complying with all occupational safety and health standards and regulations promulgated by the department . . . . ··

14. 514 P.2d at 23.

of great difficulty. Where there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se; but where there exists a legislative enactment expressing for the safety of others, in general or abstract terms, a rule of conduct, negligence per se has no application, and liability must be determined by the application of the test of due care as exercised by a reasonably prudent person under the circumstances of the case.

In other words, if a positive and definite standard of care has been established by legislative enactment whereby a jury may determine whether there has been a violation thereof by finding a single issue of fact, a violation is negligence per se; but where the jury must determine the negligence or lack of negligence of a party charged with the violation of rule of conduct fixed by legislative enactment from a consideration and evaluation of multiple facts and circumstances by the process of applying, as the standard of care, the conduct of a reasonably prudent person, negligence per se is not involved.

■ In the event the trial judge determines adoption is inappropriate because only a "reasonable man" statute or administrative regulation is involved, then the trial court is free to decline to frame its instructions to the jury in terms of whether or not the statute or administrative provision was violated. In such circumstances the traditional jury instructions pertaining to the reasonably prudent person will suf-

fice. Thus, if the trial court decides the statute or administrative regulation should not be adopted as the controlling standard of care, and it gives adequate instructions covering the standard of care prescribed by ordinary principles of negligence, the statute or administrative regulation can be ignored in the court's instructions. Even under these circumstances, however, if the statute or administrative regulation is deemed relevant, then the trial court may permit the introduction of testimony showing violation as evidence of negligence.[15] Thus, if the circumstances warrant, the trial court has discretion to refer to the statute or administrative regulation and inform the jury that a violation of either is evidence of negligence.[16]

■ This brings us to the question of whether the superior court correctly applied the principles of *Ferrell* and *Breitkreutz* in the case at bar when it decided to adopt the particular sections of the General Safety Code as the applicable standard of care. The sections of the General Safety Code[17] given to the jury in the court's instructions furnish, in our view, specific and definite standards regarding the minimum acceptable means of constructing and bracing a scaffold such as that provided Rich. These regulations are not couched in "general or abstract terms"; they embody positive and definite standards of care. The sections do not require the negligence of a party to be determined from a consideration and evaluation of multiple facts and circumstances by the process of applying, as the standard of care, the conduct of a reasonably prudent person.

■ In deciding to adopt the General Safety Code provisions as the applicable

---

15. Restatement (Second) of Torts § 288B(2) (1965) provides:
> The unexcused violation of an enactment or regulation which is not so adopted may be relevant evidence bearing on the issue of negligent conduct.

16. In *Ferrell v. Baxter*, 484 P.2d 250, 265 (Alaska 1971), we said:
> However, in the unlikely event the court does not adopt the statutory command as

the standard of reasonable behavior, it may either permit the violation to be introduced as evidence relevant to the negligence issue—or it may exclude it altogether. (citing *Meyst v. East Fifth Ave. Serv., Inc.*, 401 P.2d 430, 435–36 (Alaska 1965)).

*Accord, McLinn v. Kodiak Elec. Ass'n*, 546 P.2d 1305 (Alaska 1976).

17. Note 8, *supra*.

standard of conduct of a reasonable man, the superior court necessarily had to follow the criteria enumerated in Section 286, Restatement (Second) of Torts (1965). This section of the Restatement provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Appellants have argued that the terms of the General Safety Code "did not apply" to their activities as general contractor at the McGrath School site.

The Code provisions were promulgated to further delineate the statutory obligations of AS 18.60.075(a) that "[a]n employer shall . . . adopt and use methods and processes reasonably adequate to render the employment or place of employment reasonably safe; and . . . do every other thing reasonably necessary to protect the life, health, safety and welfare of employees." There is no question that Bachner-Northwest was an "employer" as that term is defined in the relevant statutory provision, AS 18.60.105; consequently, appellants are in error when they contend the terms of the Act and the Code

did not apply to Bachner-Northwest. The Act and Code unquestionably did impose duties on the general contractor. The more troublesome question is whether those duties extended to the protection of employees of a subcontractor such as Rich. In other words, was it the purpose of the regulations ". . . to protect a class of persons which includes the one whose interest is invaded . . .", namely, appellee Kenneth Rich?

We have already considered the purpose of a related provision of the General Safety Code, § 300–20, in *State v. Marathon Oil Co.*, 528 P.2d 293 (Alaska 1974). That section of the Code, published under the title "General Requirements", essentially reaffirms the statutory obligation of employers to maintain a safe place of employment, use safe methods and processes, and do everything reasonably adequate to render employment safe "for employees."[18] In *Marathon Oil* the issue was whether statutorily authorized criminal sanctions could be imposed on a general contractor for Code violations resulting in injury to the employees of a subcontractor. The general contractor, Marathon Oil, raised essentially the argument made here: namely, that the provisions of the General Safety Code are intended to benefit only those in a conventional employer-employee relationship, and the safety duties imposed on an employer are owed only to those in his immediate employ.

We rejected that argument rather explicitly:

We are asked to interpret Section 300.20 in a way that would limit its applicability

18. In full § 300–20 provided:
 Every employer shall furnish employment and maintain a place of employment which are safe for the employees therein.
 No employer shall require any employee to go or be in any employment or place of employment which is not safe.
 No employer shall fail or neglect to:
 (1) Provide or use safety devices and safeguards.
 (2) Adopt and use methods and processes reasonably adequate to render the employment and place of employment safe.

 (3) Do everything reasonably necessary to protect the life and safety of employees.

 (4) Where any toxic materials are used or stored warning signs will be posted with a white background and red letters not less than 3 inches high.

 No employer, owner, or lessee of any property shall construct or cause to be constructed any place of employment that is not safe.

solely to Marathon's employees. Such an interpretation would mean that an employer need make his place of employment safe only for those who come within the legal definition of his employees. According to Marathon, the safety of other persons who might be working on the premises, such as the employees of an independent contractor would not be the responsibility of the employer even though the employer controlled the premises and benefited from the work performed. Such a limited interpretation is not desirable and would substantially weaken the principal objective of the provision.

The focus of Section 300.20 is directed toward the safety of the place of employment rather than toward the legal relationship existing between the employer and those who may be performing work on the premises. The section provides in part:

> 'No employer, owner or lessee of any property shall construct or cause to be constructed any place of employment that is not safe.'

We conclude that the intent of Section 300.20 is to require employers to furnish a safe place of employment for all employees who may be on their premises.[19]

Our decision in *Marathon Oil,* then, rested on the conclusion that the General Safety Code provision requiring the employer to maintain a safe place of employment was enacted for the benefit of all employees lawfully on the premises. On this occasion we reaffirm our broad interpretation of the Code. The legislature neither expressly nor implicity restricted the scope of the general safety duties created by AS 18.60.-075, nor did the Department of Labor curtail that scope when it promulgated the more specific provisions of the Code. Among those provisions were certain ones governing the safe assembly of scaffolding. In our view, these provisions were intended to protect all employees at the job site, not simply those in the immediate employ of the general contractor, Bachner-Northwest.

As we interpret the Code, these scaffolding provisions were intended to protect a class of persons that included employees of subcontractors, such as Kenneth Rich. Consequently, the first criterion of Restatement § 286 was satisfied. Since the other three criteria of § 286 were also met, it was not error for the superior court to adopt the scaffolding provisions of the Code as a more definitive statement of the duty of reasonable care owed by a supplier of a chattel under Restatement (Second) of Torts § 392 (1965). The General Safety Code does not alter the source of appellants' duty to exercise reasonable care, which remains Bachner-Northwest's status as the supplier of a chattel, but it defines that duty more precisely.

Appellants' final point in relation to the negligence per se issue is that the superior court erred in failing to instruct the jury that an excused violation of the General Safety Code was not negligence under section 288A of the Restatement.[20] Bachner-Northwest advances three reasons why it was entitled to an instruction on excuse.[21] First, Bach-

19. 528 P.2d at 297.

20. No reasons appear on record why the superior court refused to instruct as to excuse. We believe the better practice is for the trial court to state its reasons on the record for such a ruling.

21. Restatement (Second) of Torts § 288A (1965) provides:
(1) An excused violation of a legislative enactment or an administrative regulation is not negligence.
(2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when
(a) the violation is reasonable because of the actor's incapacity;
(b) he neither knows nor should know of the occasion for compliance;
(c) he is unable after reasonable diligence or care to comply;
(d) he is confronted by an emergency not due to his misconduct;
(e) compliance would involve a greater risk of harm to the actor or to others.

ner-Northwest argues that any violations on their part were excused because they believed they were in compliance with the pertinent sections of the Alaska General Safety Code. We find this contention devoid of merit. As we have previously noted, there is evidence that Bachner-Northwest's employees were following trade custom and thought the scaffold was safe, but no evidence that they were attempting to comply with the terms of the General Safety Code. Bachner-Northwest next contends that the violation was excused because it was ignorant of the Code provisions and, thus, unable to comply with its requirements. In *McLinn* [22] we recognized "One form of ignorance . . . as an excuse in these statutory violation cases, [namely] where a party's infraction is due to innocent ignorance of the operative facts which make the statute or regulation applicable . . . ." In the case at bar, we find the scope of the Safety Code provisions, and their applicability to the facts of this case, clear. Thus, we reject Bachner-Northwest's second proferred basis for excuse. Appellants' third basis for excuse is that the General Safety Code provisions sanction noncompliance when "reasonable safety is thereby secured." More particularly, appellants argue that the method used by them in constructing the scaffold provided sufficient rigidity to allow a departure from the Code's cleating provisions. Section 300–20 of the General Safety Code authorizes noncompliance but appears to require prior permission to deviate from the Code. Since the record does not show that prior permission was obtained, this proferred excuse is unavailable to Bachner-Northwest. We consequently conclude that the superior court did not err in refusing to give the jury any instructions on the effect of an excused violation of the provisions of the General Safety Code.

Appellants next contend that the superior court abused its discretion in permitting two treating physicians to express the opinion that Kenneth Rich had fallen.

Dr. Mead and Dr. Mills, Rich's treating physicians, testified on behalf of appellees. Each expressed an opinion that, based upon his physical examination and the history supplied, Rich had suffered a contusion of the brain. On cross-examination by counsel for Bachner-Northwest, hypothetical questions were propounded to both doctors in an effort to elicit testimony that Rich's injuries might have been caused by something other than a contusion. Both doctors refused to so testify, stating that even absent evidence of a fall in the patient's history, a brain contusion would have been their diagnosis.

On redirect examination, Dr. Mills was asked, over objection:

As a physician considering reasonable and likely events, would it be reasonable under such a set of facts to exclude the possibility of a fall, as you were asked to do?

Dr. Mills failed to respond directly to the question but, instead, restated his opinion that based on the history which had been given to him, there had been a fall.

At a subsequent point in the course of counsel's redirect examination, Dr. Mead was asked, again over objection by Bachner-Northwest:

Well, what is the most reasonable— what is the most reasonable inference that you, as a medical man, considering these physical facts as history, would come to, as the cause of Kenneth Rich's injury, considering the physical facts?

Dr. Mead responded: "A fall with a blow to the head."

Bachner-Northwest contends that these questions, on redirect, were improper in that they invited the witnesses to testify as to an ultimate issue in the case, the cause of Rich's injuries.

 We think such testimony was properly admitted. In *Adkins v. Lester,*

22. *McLinn v. Kodiak Elec. Ass'n, Inc.*, 546 P.2d 1305, 1314 (Alaska 1976).

530 P.2d 11, 16 (Alaska 1974), where a police officer had been allowed to give his opinion on the causes of a traffic accident, we stated:

> Under proper circumstances, an expert witness may express an opinion on an ultimate issue. *Ferrell v. Baxter*, 484 P.2d 250, 268–269 (Alaska 1971); *Oxenberg v. State*, 362 P.2d 893, 900 (Alaska), cert. denied, 368 U.S. 56, 82 S.Ct. 189, 7 L.Ed.2d 128 (1961). It is necessary as a condition for the admission of such testimony only that the jury '. . . could receive appreciable help or assistance from the opinion of the expert witness. . . .' (footnote omitted)

Thus it is clear that expert testimony on the ultimate issue is permissible in some circumstances.

Here we find that the physicians' testimony regarding the possibile cause of Rich's injury was likely to provide such assistance to the jury. The opinions expressed by Dr. Mills and Dr. Mead were reached in the process of diagnosing Rich's injuries. Indeed, the opinions were an important part of the diagnosis and treatment by the doctors. Given the qualifications of the witnesses, we hold that it was proper to permit them to express their opinions of the cause of Rich's injuries.[23]

Bachner-Northwest further asserts that the superior court erred in admitting testimony of appellees' expert witness concerning better methods which appellants might have utilized in constructing the scaffold. The expert witness was asked, on direct examination, what additional changes in the scaffolding he would recommend in order to comply with good safety practice. Over objection, the expert stated that guardrails, toe boards, and a ladder for access were in order. Bachner-Northwest challenges the relevancy of this testimony.

Appellees' case against Bachner-Northwest was built on the fact that appellants were negligent in constructing the scaffold by failing to cleat the walkway planks on top of the scaffold and by failing to provide the appropriate bracing as required by the Alaska General Safety Code.

For evidence to be admissible it must be relevant; to be relevant, the evidence must tend to establish a material proposition. *Hartsfield v. Carolina Casualty Insurance Co.*, 451 P.2d 576, 578 (Alaska 1969). The testimony procured from the appellees' expert witness as to the desirability of guardrails and toe boards did not tend to establish a material proposition in this case. At no time did appellees assert that the lack of these fixtures had contributed to Rich's injury. The testimony of these possible improvements did not tend to prove that the scaffold had been improperly braced or cleated by appellants, nor was it relevant to the issue of contributory negligence by Rich. While Alaska's trial courts are vested with broad discretion in the area of expert testimony,[24] we believe that the testimony concerning guardrails and toe boards was improperly admitted.[25] On the other hand, the testimony pertaining to the absence of a ladder was relevant to the reasonableness of Rich's alleged practice of "walking" the scaffold, and its admission was not error. In any event, since liability will have to be retried because of our holding with respect to the contributory negligence question, we

---

23. It should also be noted that the doctors never asserted that Rich fell from the scaffold, only that there had been a fall.

Our holding is consistent with the apparent trend of recent authorities. *E. g.*, Rule 704, Federal Rules of Evidence, provides:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

24. *City of Fairbanks v. Nesbett*, 432 P.2d 607 (Alaska 1967).

25. Compare *Otis Elevator Co. v. McLaney*, 406 P.2d 7, 15 (Alaska 1965), where it was error for reasons of policy to admit evidence of subsequent improvements at an accident site.

need not consider whether the admission of the guardrail and toe board testimony constituted prejudicial error.

■■■ Appellants have also raised another relevancy issue in this appeal. They contend that the superior court erred in failing to instruct the jury that the contract between Bachner-Northwest and Totem, Rich's employer, was not relevant to any material issue in the case.

Rich did not contend that he was a third-party beneficiary to the contract. The contract was never admitted into evidence, but portions of the contract were read to the jury by both counsel. Bachner-Northwest argues that the jury may have been prejudiced by this testimony and may have concluded that Bachner-Northwest owed Rich a special "contractual" duty. From this they conclude that the trial court should have provided the jury with a cautionary instruction designed to prevent consideration of the contract.

We agree that the contract between Bachner-Northwest and Totem was irrelevant. However, given the relatively minor emphasis it received at trial, evidence of the contract was so innocuous that any error that was committed in failing to provide the requested cautionary instruction was harmless within the criteria of our decisions in *Love v. State,* 457 P.2d 622 (Alaska 1969), and *Adkins v. Lester,* 530 P.2d 11 (Alaska 1974). Accordingly, we hold that such error does not call for a reversal of the jury's determination of appellants' liability.

In their specifications of error, Bachner-Northwest further contends that the superior court abused its discretion by prohibiting them from arguing their theory of causation to the jury. This specification of error is controlled by our resolution of the contributory negligence issue. The superior court refused to allow Bachner-Northwest to argue what it considered to be essentially a contributory negligence theory, since contributory negligence was no longer an issue in the case. The gist of the argument was that even if Rich's conduct was not negligent, his own activities and method of utilization of the scaffold, rather than any negligence in the scaffold's construction, was the cause of his injuries.

Bachner-Northwest was certainly entitled to argue the issue of proximate cause. Thus, quite properly, Bachner-Northwest argued its theory that Rich's injuries were caused by a thrombosis stroke. It was also permitted to argue that Rich had dismantled the scaffold, thereby weakening an otherwise solid structure, so that any fall he might have suffered was not proximately caused by any negligence in the original construction, even though it is questionable whether there was sufficient evidence to permit such argument. It is clear, therefore, that Bachner-Northwest was allowed to argue alternative theories of causation. Further, upon retrial, appellants will have the opportunity to argue Rich's alleged negligence because determination of this question will be a focal point of the new trial.

Finally, Bachner-Northwest contends that the verdicts, as they pertain to liability, were against the weight of the evidence. We disagree. Our discussion of the propriety of the superior court's ruling on appellants' motion for a directed verdict is equally applicable here. Viewed in its entirety, and considering all reasonable inferences that could be drawn therefrom, the evidence more than adequately supports the verdicts returned by the jury.

■■■ In conclusion, we hold that it was error for the superior court to direct a verdict against appellants on the question of Rich's contributory negligence. As to that defense, Bachner-Northwest adduced evidence sufficient to take the question to the jury. A new trial is therefore required. Further, on retrial the effect of Rich's possible negligence will be governed by the principles of comparative negligence

**448**

set forth in *Kaatz v. State,* 540 P.2d 1037 (Alaska 1975). *See Sloan v. Atlantic Richfield Co.,* 546 P.2d 568, 569 (Alaska 1976). Beyond that, however, there remains some question whether the new trial should be limited in scope to question of liability, or whether there should be a new trial on all the issues including the question of damages. We have decided to solicit the views of the parties on this issue. Therefore, the parties may serve and file simultaneous briefs on this issue within 20 days after service of this opinion.

Affirmed in part, reversed in part.

ERWIN, Justice (concurring).

I concur with the treatment of the issues herein, but I wish to express the view that the time has come for this court to re-examine the doctrine of negligence per se for violation of a statute or regulation as adopted in *Ferrell v. Baxter*,[1] *Breitkreutz v. Baker*[2] and subsequent cases.[3]

Justice Rabinowitz in his dissent to *Ferrell*[4] noted that the concept that violation of a statute, ordinance or a regulation was evidence of negligence was easier to grasp by jurors and presented fewer difficulties from the vantage point of judicial administration. I agree, for the cases consistently demonstrate that conceptual problems arise when a violation of statute has been found in the first instance, while a finding of excuse by the jury results in the ultimate determination that there was no violation of the statute. This problem is avoided where the trier of fact, upon finding a violation of statute, decides that the violation is excusable.[5]

The judge or jury under the adopted Restatement rule[6] is asked initially to find a violation of statute or ordinance and then to consider the categories of excuse. If the jury then finds excuse,[7] the violation is not negligence.[8]

More importantly, however, Justice Rabinowitz noted that such a doctrine emphasized the traditional role of the jury in determining the standard of reasonable care.

It is becoming extremely difficult to undertake any business endeavor without violating some regulation, and this case demonstrates the problems with the negligence per se standard in an era where safety regulations of three levels of government (federal, state and local) are proliferating at an incredible rate.

The focus of determining the standard of reasonable care shifts from the jury to the judge who must rule whether or not a statute or regulation has been violated and thus the party is guilty of negligence per se. The proper label removes the issue from jury consideration.

In view of the adoption of the doctrine of comparative negligence, I would overrule *Ferrell, Breitkreutz* and their progeny following the negligence per se standard and announce, at the very least, that in future cases we would follow the "evidence of negligence" path.

BURKE, Justice (dissenting in part, concurring in part).

I dissent from that portion of the majority opinion holding that it was error for the superior court to direct a verdict against Bachner-Northwest, on the issue of Rich's contributory negligence.

As this court observed in *Roach v. Benson*, 503 P.2d 1392, 1393 (Alaska 1972):

> Contributory negligence has been defined as conduct of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legal cause contributing to the harm suffered by plaintiff. . . . Plaintiff is required to conform his conduct to that of the reasonably prudent man, and a failure to do so is contributory negligence. (footnote omitted)

Thus, in that case, we held that a finding of contributory negligence was clearly erroneous where our review of the record failed to reveal any unreasonable conduct on the part of the plaintiff.

1. 484 P.2d 250 (Alaska 1971).

2. 514 P.2d 17 (Alaska 1973).

3. *McLinn v. Kodiak Electric Association, Inc.*, 546 P.2d 1305 (Alaska 1976); *Clabaugh v. Bottcher*, 545 P.2d 172 (Alaska 1976).

4. 484 P.2d 250, 271 (Alaska 1971).

5. *See Breitkreutz v. Baker*, 514 P.2d 17, 24–25 (Alaska 1973).

6. *See* Restatement (Second) of Torts § 288A (1965).

7. *Id.* at Section 2.

8. *Id.* at Section 1.

**450**

The authorities make it abundantly clear that the principle question in cases presenting issues of contributory negligence is not whether the plaintiff exposed himself to a risk of harm, but whether his conduct was *unreasonable* under the circumstances.

The late Dean William Prosser wrote:

[C]ontributory negligence, in general, is governed by the same tests and rules as the negligence of the defendant. The plaintiff is required to conform to the same broad standard of conduct, that of the reasonable man of ordinary prudence under like circumstances. The unreasonableness of the risks which he incurs is judged by the same process of weighing the importance of the interest he is seeking to advance against the probability, and probable gravity, of the anticipated harm to himself. (footnote omitted) [1]

Accordingly, it has been held that before a workman can be deemed contributorily negligent for failing to follow a safer alternative course of action, it must be shown that the alternative is, in itself, reasonable. *Galloway v. Employers Mutual of Wausau,* 286 So.2d 676, 684 (La.App. 1974).[2] As stated in 57 Am.Jur.2d, Negligence § 344 at p. 747:

One is not always chargeable with negligence even though he does not adopt the safest and best course to avoid injury, since the inquiry is not whether the plaintiff actually chose the least safe of the avoidable courses, but whether he failed to exercise that degree of care required of a reasonably prudent person under the circumstances. (footnotes omitted)

A similar statement is found in 65A C.J.S. Negligence § 122 at pp. 76–77:

One is not guilty of negligence in pursuing a course of conduct that an ordinarily prudent person would choose under the same or similar circumstances, although there was open to him a safer course, or even a course which was absolutely safe. (footnotes omitted)

Turning to the facts in this case, I fail to see how a jury could reasonably find Rich guilty of contributory negligence.

As I view the record, there was overwhelming evidence that Rich's habit of "walking" the scaffold was the customary, approved and required method among tapers of using a rolling scaffold. Bachner-Northwest's own foreman admitted that painters and tapers customarily use the "walking" method of locomotion.

P. G. Hupperton, the Richs' safety expert, while acknowledging that there was a safer method of "taping" from a scaffold, stated that "walking" was the customary method. He also explained why the practice was necessary. According to Hupperton, a taper will cover the area he can reach from any one position in 30 to 90 seconds. To continue with his work, he must then move the scaffold.

Bob Maxim, a fellow taper, agreed that "walking" the scaffold was the customary method of locomotion used by tapers. His estimate of the time between moves differed somewhat from that of Hupperton; according to Maxim, relocation would be required only every 10 to 20 minutes. However, he added: "[T]he production would be next to nothing if you couldn't move it from up above. . . ."

Ben Humphries, the business agent for Rich's union, with 14 years of actual experience in taping, testified that rolling scaffolding is used to expedite the work and that the typical method of locomotion used by tapers is to use "pressure against the ceiling or the wall to propel himself along". He further confirmed Hupperton's testimony that a taper can work in a given location for only "a very brief period. . . . It would only take a few seconds to tape it." Moreover, according

---

1. Prosser, The Law of Torts § 65, pp. 418–419 (4th ed.).

2. *See also Chaney v. Brupbacher,* 242 So. 2d 627 (La.App.1970).

to Humphries a taper must work continuously:

> You must keep a wet . . . either painting or taping, you keep a wet surface, you know, a continuity, a nice wet surface. It makes better joints in a continuous operation.

In addition to the foregoing, Humphries gave the following answer when questioned by Mr. Luce, one of appellees' attorneys:

MR. LUCE: Mr. Humphries, would your men be able to keep their jobs if they insisted . . . utilizing a rolling scaffold, on getting down and moving it by hand each time that they wanted to move the scaffold?

MR. HUMPHRIES: No, they wouldn't keep their job. Production is the name of the game in construction work.

One more factor, in evaluating the reasonableness of Rich's conduct, is the fact that the scaffold was not equipped with a ladder for mounting and dismounting from the stage or working surface which was approximately six feet above the ground. Safety Code Regulation 318-79 provides:

> Where the distance from the ground to the lower platform of a pole scaffold is more than five (5) feet, access to the platform in the form of a runway or ladder shall be provided.

Given the foregoing, I am of the opinion that reasonable people could reach but one conclusion in this case: that Rich was performing his work in the manner of a reasonable and prudent person, by utilizing the walking method of locomotion. Faced with the limited alternatives that were available to him, a workman in the position of Rich could not reasonably be expected to dismount from a six foot scaffold, having no ladder, every time he completed a few minutes of taping work, unlock the wheels, move the scaffold, relock the wheels, then remount the scaffold for another few minutes of work. In short, to expect him to utilize the suggested alternative form of locomotion is unreasonable under the circumstances.

It is important to note that there is no evidence that Rich ever "walked" his scaffold carelessly or in anything but the usual and customary manner.

Bachner-Northwest argues that there was no evidence that Rich had to perform his work in the manner that he apparently did, and points to the fact that under his union agreement he had the right to leave any job where unsafe equipment or practices were utilized. It is suggested that Rich could have insisted that the job be done differently. I find such an argument unpersuasive.

Almost every human endeavor carries some risk of harm to the actor or others. And, almost any type of conduct could be altered to reduce the risks involved. But the fact that a plaintiff engages in conduct that carries a greater risk of harm than some alternative form of conduct does not necessarily mean that he or she is acting without due regard for his or her own safety. This would seem to be particularly true where, as in this case, such conduct conforms to the customary practice of a particular trade, which apparently involves no undue risk for the workman if performed with proper equipment. To expect a workman in that situation to demand that the work be done differently or to expect him to leave the job merely because his union contract *might* permit him to do so, is expecting too much.

In summary, the majority, while presumably applying a "reasonable man" standard, seems to envision that rather remarkable fellow, the "reasonable man", as he was described by A. P. Herbert, who wrote:

> He is an ideal, a standard, the embodiment of all those qualities which we demand of the good citizen. . . . He is one who invariably looks where he is going, and is careful to examine the immediate foreground before he executes a leap or a bound; who neither stargazes nor is lost in meditation when approaching trapdoors or the margin of a dock; . . . who never mounts a moving

omnibus and does not alight from any car while the train is in motion . . . and will inform himself of the history and habits of a dog before administering a caress; . . . who never drives his ball until those in front of him have definitely vacated the putting-green which is his own objective; who never from one year's end to another makes an excessive demand upon his wife, his neighbors, his servants, his ox, or his ass; . . . who never swears, gambles or loses his temper; who uses nothing except in moderation, and even while he flogs his child is meditating only on the golden mean.[3]

It seems to me that we should perhaps expect a little less under the circumstances shown by the record in this case.

In all other respects I concur.

## OPINION ON REHEARING

Appellees have petitioned this court for reconsideration of one issue. We have determined to grant the petition in order to correct a factual error which appeared in *Bachner v. Rich.*

■ Appellees' theory of liability is that appellants owed Kenneth Rich a duty to exercise reasonable care in the construction of a scaffold which they supplied to Rich, and that appellants' breach of that duty proximately caused Rich's injuries. In the superior court, appellees emphasized certain provisions of the General Safety Code applicable to the construction of scaffolds. These provisions governed the proper cleating and bracing of such scaffolds. Relying upon principles of negli-

gence per se, appellees argued that appellants' failure to comply with these regulations established their negligence as a matter of law.

Review of the record, however, discloses that appellees did not rely exclusively on the alleged breach of the regulations. They further contended that the duty of due care required appellants to affix to the scaffold other safety devices not specifically required by the General Safety Code. Although relatively little evidence and argument was devoted to this aspect of appellees' case, this theory of due care was in fact raised during the course of the trial. Thus, the statement in our previous opinion in this case to the effect that "[a]t no time did appellees assert that the lack of these fixtures had contributed to Rich's injury" is incorrect.[1]

One piece of evidence which was offered bearing on this contention was the testimony of appellees' expert safety witness. That witness testified as to the desirability of guardrails and toe boards, which were not affixed to the scaffold supplied to Rich. That testimony was, of course, relevant to the contention that due care required the placement of certain safety features not expressly mandated by the code. Scant argument was presented as to the manner in which the failure to have guardrails or toe boards proximately contributed to Rich's injuries. A borderline case is presented whether such testimony was relevant in regard to establishing such a proximate cause. Our rules, however, prescribe that in such cases "the principle which favors the reception of the evidence shall govern."[2] Thus, we have concluded that it was not error to admit the testimony.

---

3. A. P. Herbert, Misleading Cases in the Common Law, pp. 11–16 (1930). It is perhaps also worthwhile to note Herbert's further observation that: "In all that mass of authorities which bears upon this branch of the law there is no single mention of a reasonable woman." *Id.* at 16. These quotations also appear in Prosser, The Law of Torts § 32 at pp. 150–151, note 21 (4th ed.).

1. At page 52 of appellants' opening brief, the following statement is found: "At no time did plaintiffs allege that Rich fell from the scaffold because of the failure of defendants to build the scaffold with guardrails, toe boards or a ladder for egress and ingress."

2. Alaska R.Civ.P. 43(b).