**George and Anna BALLUM, Appellants,**

v.

**WEINRICK'S, INC., Appellee.**

**No. 4842.**

Supreme Court of Alaska.

Sept. 18, 1981.

---

Judith J. Bazeley, Bazeley & Harrington, Anchorage, for appellants.

Paul W. Waggoner, Biss & Holmes, Anchorage, for appellee.

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

Before RABINOWITZ, C. J., CONNOR, BURKE and COMPTON, JJ., and DIMOND, Senior Justice.*

OPINION

CONNOR, Justice.

This is an appeal from a directed verdict for the defendant in a negligence action. George Ballum suffered injuries to his arms, head, and face on August 4, 1976, when he fell from a ladder while repairing an overhead garage door at a gas station in Cordova owned by the defendant, Weinrick's, Inc. Ballum sued Weinrick's for personal injuries and his wife joined with a loss of consortium claim. At the close of evidence the trial court directed a verdict for Weinrick's on the ground that liability was not established. The trial court declined to rule on Weinrick's other basis for a directed verdict, which was that Ballum was an "employee" and, therefore, that worker's compensation provided the exclusive remedy for Ballum's injuries.

Ballum asserts that Jack Weinrick, the owner/operator of Weinrick's, Inc., was negligent in one of three ways: (a) by failing to turn the premises over in a safe condition; (b) by failing to hold the ladder to keep it from slipping; or, (c) by failing to warn Ballum of the ladder's dangerous properties. All of these are omissions and thus, for negligence liability to attach, Ballum must establish "some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act." W. Prosser, The Law of Torts § 56, at 339 (4th ed. 1971).

The evidence adduced at trial established the following. Jack Weinrick, owner of Weinrick's, Inc., admitted approaching Ballum and requesting his help in repairing the garage door at Weinrick's gas station. Ballum, and the subsequent repairman, testified that Weinrick was eager to get the

door fixed so that he could lock up that night. Weinrick considered the situation an "emergency." Weinrick testified that he offered to pay Ballum for his assistance, although Ballum does not remember this. Ballum stated he never intended to bill Weinrick's for the work, apparently relying instead on remuneration in the form of business referrals.[1]

Ballum testified that he agreed to help with the door if he had enough time. Later that day, he testified, he went over to Weinrick's and offered to help if Weinrick "would give mé a hand . . . ." Ballum testified that the two men could not find a ladder at first, but then saw one across the street. According to Ballum, the two men went and got the ladder, returned, and set it up by the door. Weinrick, on the other hand, testified that Ballum found the ladder near Ballum's own residence, and that he, Weinrick, merely helped carry the ladder across the street. Weinrick did not own the ladder. Gordon Grigsby, an employee of Weinrick's, testified that he saw Ballum carry the ladder into the shop, but he did not see who carried it from across the street, and he indicated it was possible that Weinrick helped carry the ladder.

In addition to the dispute over who "supplied" the ladder, there is some dispute over whether Weinrick offered to, was requested to, or actually did assist Ballum by holding the ladder. Ballum testified that Weinrick initially held the ladder, but that Weinrick was not continuously present. Ballum stated that Weinrick left shortly after he started the job, but that Weinrick said he would return. Ballum testified that that was the last assistance he received from Weinrick. Ballum also testified as follows:

"Q. When you climbed up that ladder just prior to your accident, you were fully aware that no one was holding it?

A. I'm sure I was.

Q. You never asked Jack to assign an employee to help you, did you?

A. No.

Q. You can't recall ever asking Jack to hold the ladder, can you?

A. I could have done that.

Q. You can't recall it though?

A. I believe when we first got the ladder, I might have asked him then, but I'm not sure."

Weinrick testified that he offered to hold the ladder, but that Ballum told him his help was not needed. Gordon Grigsby, Weinrick's employee, testified that he also offered to hold the ladder but that Ballum also declined his assistance. Grigsby also confirmed that Weinrick offered to hold the ladder numerous times but that Ballum declined.

Subsequently, while working on the door, the aluminum ladder slipped out from under Ballum, causing him to fall to the floor. Ballum could not recall exactly what he was doing at or immediately prior to the accident. Ballum had been using the ladder, going up and down it, for about three hours before the accident occurred. Before the fall, Ballum had positioned the ladder himself. Ballum had previous experience working with ladders when he was a sheet-metalsmith.

Art Keyes witnessed the fall. Keyes was on the premises discussing a possible job as a mechanic with Weinrick's manager. He was being shown around the shop when he saw, in the upper part of his peripheral vision, the ladder fall from underneath Ballum. He indicated that Jack Weinrick "showed up almost immediately" after Ballum's fall, and that Weinrick's "exact words [upon seeing the accident] were 'That's the same God damn ladder that we had the accident before with.' " He testified that he was able to hear the statement because he was standing right next to Weinrick, and that the service manager was close enough to have heard the remarks. That employee (Grigsby), however, testified that he did not overhear any remark by Weinrick.

1. In 1975, Ballum operated a laundry and a heating business. He testified that he sought referrals because Weinrick sold oil and he, Ballum sold service.

Immediately after the fall an employee of Weinrick's went across the street to Ballum's business and told Ballum's son, Bruce, about the accident. Bruce got his mother, and the two went over to Weinrick's. Someone called an ambulance, which arrived shortly thereafter. Bruce went on to testify about certain remarks that Weinrick made at the scene (because of its relevance to Weinrick's possible knowledge of the ladder's dangerousness, the entire series of statements is set out):

"A. Okay. As they were moving my father ... I did see Jack [Weinrick] standing there and he mentioned that he said the same thing happened to me, and I was—it was not a surprise to me, because I knew that—

MR. BISS: I'll object to—

THE COURT: Yes; the witness will confine himself to his observations.

BY MR. JACOBS:

Q. You need to confine yourself to what Jack said to you at the time. Did you say anything back to him?

A. Not that I—I did say something, I don't recall exactly what. Probably just 'oh,' or something, and I was—I didn't want to say much.

.    .    .    .    .

Q. You've related to the jury what Mr. Weinrick said to you; now, did he say anything in addition?

A. Yes.

Q. What did he say?

A. Okay. I—he said that it had happened, he said the same thing happened to me, and I don't exactly remember the quote after that, but there was—I do remember a point being made concerning—

.    .    .    .    .

Q. Can you tell the jury what the subject was?

A. Yes, it was the bottom of the ladder.

Q. What did he say about the bottom of the ladder?

A. He said that the—I don't exactly—he was saying something about how they weren't—the bottom of the ladder wasn't holding the way it should, it was the bottom of the ladder, the plastic or rubber stops at the bottom that probably caused the ladder to slip."

Subsequently it was brought out on cross-examination, by way of impeachment, that Bruce had stated in an earlier deposition that his recollection of what Weinrick said was "vague."

Weinrick testified that he had never fallen from the aluminum ladder Ballum had used and that he had never told anyone that he had. He did testify that he had fallen before in his garage on another ladder, and he admitted this testimony was inconsistent with his deposition testimony, but explained that hearing Bruce Ballum's testimony reminded him of his previous fall. He indicated that his previous fall was his fault because he "was running up the ladder."

Turning to the merits of the appeal, in ruling on a motion for a direct verdict, the court is

"not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment."

*Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974); *Beaumaster v. Crandall*, 576 P.2d 988, 994 (Alaska 1978). Thus the directed verdict was proper only if it can be said that in viewing the evidence most favorably to Ballum, no reasonable jury could find in his favor. *See Mallonee v. Finch*, 413 P.2d 159, 160 (Alaska 1966). Further, we have noted (in discussing summary judgment motions) that "[a]s a general rule, issues of negligence are generally not susceptible to summary determination, but should be resolved by trial in the ordinary manner." *Webb v. City and Borough of Sitka*, 561 P.2d 731, 735 (Alaska 1977) (footnote omitted).[2]

2. The reason for this rule is:
"[b]ecause of the elusive nature of the concept of negligence, the determination of the existence of which requires the forming of a judgment as to the reasonableness of the conduct of the parties in the light of all the

In granting Weinrick's motion for a directed verdict, the trial court stated (after articulating the correct standard for judging the motion):

"I have had during the course of this trial some difficulty in understanding the issue of liability as it's developed, and while there are some provocative statements— or some testimony about the interesting statements, even when we take those statements to the end of their inferential limits, it seems to me that there is still holes in the question of liability. It's my understanding here that Mr. Jacobs [Ballum's attorney] does not contend that the ladder was furnished by Mr. Weinrick, and has stated that. He contends that in fact the Plaintiff was an independent contractor here, that he was not subject to the supervision of Mr. Weinrick. I've considered all these things and I believe that the motion of the Plaintiff [sic; it was defendant's motion] under Rule 50 is well taken."

Ballum argues that a directed verdict was improper because the jury could reach different conclusions from the facts. He argues, in essence, that in "hiring" him, Weinrick owed Ballum a duty of due care and that, given Weinrick's alleged knowledge of the ladder's dangerous properties, this encompassed a duty to warn and a duty to prevent the harm that resulted from the ladder to Ballum if reasonably able to do so (e. g., by holding the ladder).

Weinrick responds that the fact of an accident does not establish negligence, and that Ballum is improperly attempting to use *res ipsa loquitur*.[3] Weinrick also argues that Ballum was an employee whose exclusive remedy lies before the worker's compensation board.

As previously mentioned, any possible negligence by Weinrick flows from his inaction, i. e., from omissions. Generally, to impose a duty to act upon someone, there must first be a special relation creating that duty.

The most compelling basis for imposing a duty on Weinrick would derive from Weinrick's status as a supplier of a chattel, the ladder, known to be dangerous. The duty is found in Sections 391[4] and 392[5] of the

circumstances of the case. If reasonable minds could draw different inferences and reach differing conclusions from the facts the issue must be reserved for trial."

*Webb*, 561 P.2d at 735; quoting from *Harvey v. Great Atlantic & Pacific Tea Co.*, 388 F.2d 123, 125 (5th Cir. 1968).

**3.** Ballum does not advance a *res ipsa* argument, and in his reply brief agrees to the inapplicability of that doctrine.

**4.** Restatement (Second) of Torts § 391 (1965) states:

"One who supplies directly or through a third person a chattel for another to use for the supplier's business purposes, knowing or having reason to know that it is or is likely to be dangerous for the use for which it is supplied, is subject to liability as stated in §§ 388–90."

Section 388 defines that liability:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

**5.** Restatement (Second) of Torts § 392 (1965) states:

"One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it."

Restatement (Second) of Torts (1965). *See Bachner v. Rich*, 554 P.2d 430, 436–37 (Alaska 1976). Application of these sections would depend on finding that Weinrick was in some fashion a *supplier* of the ladder, that the ladder was used for Weinrick's business purposes, and that Weinrick knew (§ 391) or failed to reasonably discover (§ 392) that the ladder was dangerous, and, of course, that the ladder was in fact dangerous.

Ballum does not, however, argue the applicability of these provisions. Although the evidence, viewed most favorably to Ballum, could support a finding that Weinrick participated equally in finding and utilizing the ladder and, therefore, was arguably a supplier,[6] Ballum's attorney told the court that he does not contend that Weinrick furnished the ladder.[7]

Instead, the thrust of Ballum's complaint is that Weinrick owed him a duty as a result of the "employment" relationship. Generalizing from language in *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157, 160 (Alaska 1976), Ballum argues that if an owner of premises owes to the employees of an independent contractor the duty to avoid endangering them from his own negligence, then the same duty is owed to the independent contractor. Ballum relies on the following language:

> "[W]here an owner or general contractor is independently responsible, as by a failure to prudently exercise controls retained over the details of performing the work at the job-site, or by a failure to turn over premises free of unreasonable safety hazards, we will allow suit by the employee of the independent contractor. In general, *we adhere to the rule that the owner of premises or the general contractor thereon owes to the servants of its*

*independent contractors the duty to avoid endangering the employee by his own negligence or affirmative act . . . ."* (footnote omitted; emphasis added).

*Sloan*, 552 P.2d at 160. Ballum argues that he was an independent contractor, that Weinrick retained certain control over the project to repair the door, and, given Weinrick's alleged knowledge of the ladder's dangerousness, that Weinrick had a duty to warn Ballum or to assist him so as to preclude the ladder from injuring him.

■ We do not dispute that a duty to avoid acting negligently is owed as much to the independent contractor as to the latter's employees. The scope of that duty, however, does not encompass the situation presented here. There is no evidence that the premises were turned over to Ballum in a dangerous condition. Nor did Weinrick control the work.

The principal shortcoming in Ballum's case was the failure to introduce evidence sufficient to create a jury question regarding the ladder's asserted dangerousness. Only two statements in evidence, allegedly made by Weinrick, even bear on this question. Taking these statements most favorably to Ballum, as we must on a directed verdict appeal, they "established" the following: (a) that Weinrick's, Inc. previously had an "accident" with the same ladder; and (b) that the rubber or plastic stops on the bottom of the ladder "probably" slipped, causing Ballum's fall. Weinrick testified that his earlier accident with a ladder was his own fault due to misuse, although he denied the accident occurred on the same ladder. The second statement, regarding the bottom of the ladder, was highly speculative—it was based on no direct observations by Weinrick himself. Significantly,

---

**6.** The Restatement makes clear that ownership of the chattel is immaterial:

> "It may be leased to him or borrowed by him. It is enough that he has had possession or control of it for the purpose of using it in connection with his business, and that he has supplied it for such purpose. Indeed, the rule stated in this section would apply although the chattel had been wrongfully appropriated by the supplier to such use."

Restatement (Second) of Torts § 392, comment c (1965).

**7.** The colloquy was:

> "THE COURT: Do you contend the ladder was furnished by Mr. Weinrick?
> MR. JACOBS: No, but he knew about it."
> We note that Ballum's appellate counsel was not his trial counsel.

Ballum never produced the ladder and, as best we can determine, gave no adequate explanation for that failure. Without stronger evidence such as the ladder, a jury would have to engage in a great deal of speculation to arrive at the conclusion that the ladder was defective or dangerous.

The risk inherent in ladders is intimately tied to their use. Ladders can slip, causing injuries, without being defective or uniquely dangerous, such as when they are not used with an appropriate degree of care. The evidence was insufficient to show that the ladder was dangerous. No reasonable jury could find for Ballum and thus the trial court properly granted a directed verdict in Weinrick's favor.[8]

AFFIRMED.

RABINOWITZ, Chief Justice, dissenting, joined by DIMOND, Senior Justice.

I agree with the majority's conclusion that Weinrick was under a duty to avoid acting negligently towards Ballum, an independent contractor. My disagreement with the court's opinion is centered on its conclusion that the superior court properly granted Weinrick's motion for directed verdict.

In *Beaumaster v. Crandall*, 576 P.2d 988, 994 (Alaska 1978), we articulated the appropriate standard of review in the following manner:

> When ruling on a motion for a directed verdict under Civil Rule 50(a), the judge must view the evidence in the light most favorable to the nonmoving party ... and may grant such a motion 'only if it can be said that fair-minded jurors in the exercise of reasonable judgment could reach but one conclusion on the issue in controversy.' [citations omitted.]

Given the directed verdict context of this appeal, I am of the view that the superior court erred in granting the motion. Viewing the evidence most favorably to Ballum, the jury could have concluded that Ballum was an independent contractor to whom Weinrick owed the duty to warn of known,

non-obvious dangers. Further, the jury could have found that Weinrick knew that the ladder being used by Ballum was dangerous. Here the record contains evidence that Weinrick himself had previously fallen from the same ladder, and that after the accident in question he commented that "the bottom of the ladder wasn't holding the way it should ... the plastic or rubber stops at the bottom ... probably caused the ladder to slip." Under these circumstances I am of the view that a jury issue was presented.